STATE, ex rel. CY. H. LYLE et al., *v.* G. W. WILLETT et al.*

(*Knoxville.*   September Term, 1906.)

1.  **ELECTIONS.**   Resident inmates and employees of a Soldiers' Home over which the United States has exclusive jurisdiction are not qualified voters in elections in this State where said Home is located.

    The resident inmates and employees of the Soldiers' Home near Johnson City, in Washington county, Tennessee, as a branch of the "National Asylum for Disabled Volunteer Soldiers" for disabled volunteers of the United States army, not being residents of the State of Tennessee, but residing within the premises of said Home, are not legal voters at elections in the State, because the United States has exclusive jurisdiction over the land on which such branch Home was erected.   (*Post, pp.* 338-350.)

    See fifth headnote.

    Constitution cited and construed:   Art. 4, sec. 1 (Tenn.); Art. 1, sec. 8, subsec. 17 (U. S.).

    Statutes cited and construed:   1901, ch. 98 (Tenn.); 1866, ch. 21, 14 Stat., 10 (U. S.).

    Cases cited and approved:   Railroad v. Lowe, 114 U. S., 525; Sinks v. Reese, 19 Ohio St., 306; Foley v. Shriver, 81 Va., 574; McMahon v. Polk, 10 S. D., 296.

2.  **SAME.**   Same.   Reservation of right of inmates of Soldiers' Home to vote in elections in this State, made in act ceding exclusive jurisdiction thereover to the United States, is unconstitutional, invalid, and noneffective.

    The reservation of the right of the inmates of the Soldiers' Home to vote in elections in this State, made in the Tennessee stat-

---

*As to acquiring residence as voter by inmates of soldiers' homes or occupants of government posts, see note to Wolcott v. Holcomb (Mich.), 23 L. R. A., 215.

State, ex rel., v. Willett.

ute ceding to the United States exclusive jurisdiction over the land on which said home was erected, is unconstitutional, invalid, and noneffective. (*Post, pp.* 342-350.)

Acts cited and construed:  1901, ch. 98.

Constitution cited and construed:  Art. 4, sec. 1.

Cases cited and approved:  Railroad v. Lowe, 114 U. S., 525; Foley v. Shriver, 81 Va., 574; McMahon v. Polk, 10 S. D., 296; Cory v. Spencer (Kan. Sup.), 73 Pac., 920, 63 L. R. A., 275; Powell v. Spackman (Idaho), 65 Pac., 503, 54 L. R. A., 378; Wolcott v. Holcomb, 97 Mich., 361; Re Barry, 164 N. Y., 18.

3. **SAME.** Same.  Same.  **Invalidity of clause reserving right to vote does not render whole act unconstitutional, when.** The invalidity and unconstitutionality of the clause in said act reserving the right to vote in the inmates of such Home, as stated in the last foregoing headnote, does not render the whole act void and unconstitutional, for the legislature would have doubtless enacted the statute without the clause in question. (*Post, pp.* 349, 350.)

Cases cited and distinguished:  Jones v. Memphis, 101 Tenn., 189; Weaver v. Davidson County, 104 Tenn., 317.

4. **SAME.** Same.  **Exclusive jurisdiction of United States is not affected by the conveyance of land purchased by it to a corporation owned and controlled by it, when.** The exclusive jurisdiction of the United States over the land upon which such Soldiers' Home was erected is not affected by the fact that the land was conveyed to the National Home, a corporation, and not directly to the United States, because such Home is owned and managed by the United States, and the land was in fact purchased by the United States. (*Post, pp.* 346, 347.)

Cases cited and approved:  Railroad v. Lowe, 114 U. S., 525; State of Ohio v. Thomas, 173 U. S., 276, 281; Sinks v. Reese, 19 Ohio St., 306.

---

State, ex rel., v. Willett.

---

Cases cited and disapproved: In re Kelly (C. C.), 71 Fed., 545; In re O'Connor, 37 Wis., 379.

5. **SAME.** Same. **Inmates and employees working and eating in such Soldiers' Home, but residing with their families on the outside, may vote, if otherwise qualified.**

The inmates and employees of said Soldiers' Home, who work there and eat there regularly and irregularly, but have homes and families on the outside, where they spend their evenings and nights, and irregularly take their meals, being residents of the State, and otherwise qualified voters, are entitled to vote. (*Post, pp.* 348, 349, 351.)

See first headnote.

6. **SAME.** **Mandamus will not lie to compel erasure from registration books where the names improperly registered do not appear, when.**

The peremptory writ of mandamus will not be awarded to compel election officers to erase from the registration books the names of persons designated as residents or members of the Soldiers' Home, where it appears that some of these (as shown in the fifth headnote) might be properly registered, but neither their names, nor the names of those improperly registered, appear in the record. (*Post, pp.* 339, 350, 351.)

Cases cited and approved: Webster v. Newell, 66 Mich., 503; Clayton v. McWilliams, 49 Miss., 311.

7. **SAME.** Same. **Mandamus affecting parties not before the court will not be awarded, when.**

Where the persons, whose right to register as voters was involved, are not before the court, by appearance or service of notice upon them, the peremptory writ of mandamus will not be awarded to compel the erasure of their names from the registration books. (*Post, pp.* 350, 351.)

Code cited and construed: Secs. 5335, 5337 (S.); secs. 4314, 4316 (M. & V.); secs. 3571, 3573 (T. & S. and 1858).

State, ex rel., v. Willett.

8. **SAME. Same. Mandamus will not lie to compel erasure of names of disqualified voters from registration books, when.**
The peremptory writ of mandamus will not be awarded, after the expiration of the five days allowed for the correction of clerical errors, to compel the election registrars to erase from the registration books the names of persons alleged to be disqualified as voters, because they have no power to revise the registration after the expiration of such time. (*Post, pp.* 351-362.)

Code cited and construed:   Secs. 1189-1219 (S.).

Code Supplement (1904) cited:   Secs. 1136-1377, p. 218.

Cases cited and approved:   Turnpike Co. v. Marshall, 2 Baxt., 104; State v. Miller, 1 Lea, 596, 606, 607.

9. **SAME. Certificate of registration may be challenged before judges of election where procured by fraud or perjury; fraud defined.**
The certificate of registration may be successfully challenged before the judges of election where it is shown by proof to their satisfaction to have been obtained by fraud or perjury, or where the voter has removed, and such certificate is obtained by fraud in fact or in law where the holder thereof was not a qualified voter. (*Post, pp.* 361, 362.)

Code cited and construed:   Sec. 1204 (S.).

FROM WASHINGTON.

Appeal from the Chancery Court of Washington County.—A. J. TYLER, Chancellor, by interchange.

117 Tenn—22

HARR & BURROW, H. H. CARR, D. M. GUINN and E. C. REEVES, for Relators.

CAMPBELL & BOREN and P. E. DEVINE, for defendants.

MR. JUSTICE NEIL delivered the opinion of the Court.

The bill in this case was filed by the State of Tennessee on relation of Cy. H. Lyle and D. M. Guinn, citizens and taxpayers of Washington county, and John H. Caldwell, democratic congressional nominee in the First Tennessee district, against George W. Willett, J. H. Pierce, and J. A. Vines, election commissioners for Washington county, and H. C. Beasley, Jr., and S. P. Bolton, election registrars for the second ward or precinct of the Ninth civil district of Washington county. The purpose of the bill was to obtain a mandamus to compel the election commissioners and registrars of election to erase from the registration books the names of about five hundred persons alleged to be members of the Soldiers' Home near Johnson City, in Washington county. It is insisted that these persons were not eligible as voters, and that they were permitted to register without authority of law. The chancellor awarded an alternative writ, and, on response made thereto by the defendants, declined to issue the peremptory writ, and dismissed the bill. From this decree, the complainants have appealed to this court, and have here assigned errors.

Two questions are involved: First, whether the in-

mates of the home are legal voters; secondly, whether the writ of mandamus is the proper remedy, if a wrong has been done.

As to the first question:   We adopt the following summary of the contents of the Revised Statutes of the United States upon the subject from the case of *Sinks* v. *Reese,* 19 Ohio St., 306, 2 Am. Rep., 397, 399.   The home was established under and in conformity to the provisions of the act of congress of the United States of March 21, 1866, c. 21, 14 Stat. 10 [U. S. Comp. St. 1901, p. 3337] entitled "An act to amend an act entitled 'An act to incorporate a National Military and Naval Asylum for the relief of totally disabled officers and men of the volunteer forces of the United States.'"

"The first three sections of the act provide  for 'an establishment for the care and relief of disabled volunteers of the United States army, to be known by the name and style of the National Asylum for Disabled Volunteer Soldiers,' with a board of managers consisting of the president of the United States, secretary of war, the chief justice of the United States for the time being, together with nine others, no two of whom shall be residents of the same State, to be appointed by joint resolution of the two houses of congress, to have perpetual succession, with power to take, hold, and convey real and personal property, establish a common seal, and to sue and be sued in courts of law and equity, to make by-laws, rules, and regulations for carrying on the business and government of the asylum, and affix penalties thereto.

The fourth section confers power on the board of managers to procure sites, and to have necessary buildings erected thereon of sufficient capacity to accommodate the persons provided for. The fifth section appropriates various forfeited and unclaimed funds in the treasury of the United States to the support of the asylum, and authorizes the acceptance of donations for its benefit. The ninth section provides 'that all inmates of the asylum shall be and they are hereby made subject to the rules and articles of war, and will be governed thereby, in the same manner as if they were in the army of the United States.' And the thirteenth and last section provides 'that congress may at any time hereafter alter, amend or repeal this act.' " See Revised Statutes of the United States, sections 4825 to 4837, inclusive [U. S. Comp. St. 1901, pp. 3337-3351].

This institution, it is perceived, was created by act of congress, to carry out a special function and purpose of the government of the United States, the relief and support of its disabled volunteer soldiers. It was placed under a board appointed, and to be perpetually appointed, by the government of the United States, and to be maintained by funds from the treasury of the United States government.

A branch of the Soldiers' Home, known as the "Mountain Branch," was established a few years ago near Johnson City, in Washington county, this State, and suitable buildings were erected therefor. The land was pur-

State, ex rel., v. Willett.

chased with money appropriated by the congress of the United States.

.The provisions of the federal constitution, authorizing the purchase of such place, is found in article 1, section 8, subsec. 17: "The congress shall have power . . . to exercise exclusive legislation, in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular States, and the acceptance of congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings."

We think the power to purchase a place for a Soldiers' Home was within the intent and meaning of the section quoted, and falls directly under the clause "and other needful buildings." As said in the Ohio case referred to, such institutions are erected by the government, under its war power, since the wounding and disablement of its soldiers are a necessary incident of war, and it is as proper an exercise of the functions of government to care for such persons, after they have been disabled, as to enlist them and place them in line of duty in the service of the country where such results will necessarily follow.

Consent was given by Tennessee under the following statute.

"Section 1. Be it enacted by the general assembly of

the State of Tennessee, that the consent of the general
assembly be, and is hereby, given to the acquisition by
the National Home for Disabled Volunteer Soldiers by
purchase, condemnation, or donation of lands not ex-
ceeding two thousand (2,000) acres, in Washington
county, for the establishment and maintenance of a
branch of said home within five miles of Johnson City.

"Sec. 2. Be it further enacted, that jurisdiction of
the lands aforesaid, and their appurtenances, which may
be acquired by the managers of the National Home for
Disabled Volunteer Soldiers for the uses and purposes
of said home, be, and is hereby, ceded to the United
States of America; provided, however, that all civil or
criminal process issued under the authority of the State
of Tennessee, or any officer thereof, may be executed on
said lands and in the buildings which may be located
thereon, in the same manner as if jurisdiction had not
been ceded, as aforesaid; and provided, further, that
nothing in this act appearing shall be construed to deny
to any officer, employee, or inmate of said home, who
shall be qualified voters of the State, the right of suf-
frage at all town, county, and State elections, in the
place where said home is located, upon their complying
with the requirements of the laws that are now in opera-
tion, or that may be hereafter enacted, regulating State,
county, and town elections in this State."

It is insisted that the power to vote, reserved in the
above statute, protects the rights claimed for the inmates
of the home in the present case.

In order to determine this question, we must ascertain the nature of the right acquired by purchase for the purposes of a home by the United States with the consent of the State.

Upon this subject, in respect of places purchased by the United States, with the consent of a State, in *Ft. Leavenworth Railroad Company* v. *Lowe*, 114 U. S., 525, 5 Sup. Ct., 995, 29 L. Ed., 264, it is said: "When the title is acquired by purchase, by consent of the legislatures of the States, the federal jurisdiction is exclusive of all State authority. This follows from the declaration of the constitution that congress shall have 'like authority' over such places as it has over the district, which is the seat of the government; that is, the power of 'exclusive legislation in all cases whatsoever.' Broader and clearer language could not be used to exclude all authority than that of congress; and that no other authority can be exercised over them has been the uniform opinion of the federal and State tribunals and of the attorneys-general. The reservation which has usually accompanied the consent of the States, that civil and criminal process of State courts may be served in the places purchased, is not considered as interfering in any respect with the supremacy of the United States over them, but is admitted to prevent them from becoming an asylum for fugitives from justice." After citing and discussing authorities, the opinion proceeds: "These authorities are sufficient to support the proposition which follows naturally from the language of the consti-

tution—that no other legislative power than that of congress can be exercised over lands within a State purchased by the United States with her consent for one of the purposes designated, and that such consent, under the constitution, operates to exclude all other legislative authority." Among the authorities cited and commented upon with approval is the case of *Sinks* v. *Reese,* supra. In that case, the supreme court of Ohio, in considering a statute of that State, substantially the same as our own above set out, held, in respect of the *status* of the inmates of the Soldiers' Home, as affecting their right to exercise the elective franchise, the following: After adverting to the principle that the purchase of land, under the circumstances stated, vested supreme legislative authority in the United States, the opinion in that case proceeds:

"This leads us to consider what is the legal *status* of persons who become residents upon the grounds, and within the limits of the institution thus within the exclusive jurisdiction of the United States, and how does it affect their claim to exercise the elective franchise in Ohio, under its constitution and laws? In passing on these questions, there is little need of speculative reasoning, for they have been in effect settled by repeated decisions of courts of high and conclusive authority. By becoming a resident inmate of the asylum, a person, though up to that time he may have been a citizen and resident of Ohio, ceases to be such; he is relieved from any obligation to contribute to their revenues, and is

subject to none of the burdens which she imposes upon her citizens. He becomes subject to the exclusive jurisdiction of another power, as foreign to Ohio as are the States of Indiana or Kentucky, or the District of Columbia. The constitution of Ohio requires that electors shall be residents of the State; but, under the provisions of the constitution of the United States, and by the consent and act of cession of the legislature of this State, the grounds and buildings of this asylum have been detached and set off from the State of Ohio, and ceded to another government, and placed under its exclusive jurisdiction for an indefinite period. We are unanimously of the opinion that such is the law, and with it we have no quarrel, for there is something in itself unreasonable that men should be permitted to participate in the government of a community, and in the imposition of charges upon it, in whose interests they have no stake, and from whose burdens and obligations they are exempt."

In *Foley* v. *Shriver*, 81 Va., 574, the supreme court of appeals of Virginia, in speaking of the National Home near Elizabeth City, in that State, said: "In this case, the State legislature having given the required consent, and the United States having purchased the land in question, the United States have acquired, under the federal constitution, exclusive jurisdiction over the ceded lands, and they are no longer a part of the State of Virginia, and are not subject to the jurisdiction of the State courts. Persons residing there are not citizens of

Virginia, the property situated there is not subject to the control or disposal of any State court, and the circuit court of Elizabeth City county is without jurisdiction within the said territory." To the same effect, see *McMahon* v. *Polk,* 10 S. D., 296, 73 N. W., 77, 47 L. R. A., 830, 837; McCrary on Elections (4th Ed.), sec. 89; Paine on Elections, sec. 18; 15 Cyc. of Law and Proc., 294; 10 Encyc. of Law (2d Ed.), 607.

By section 1 of article 4 of our constitution of 1870, it is provided, as necessary qualifications for voting, that the voter shall be a "male person of the age of twenty-one years;" that he shall be "a citizen of the United States," also the following: "And a resident of this State for twelve months, and of the county wherein he may offer his vote for six months next preceding the day of election."

If, as we have held, and as controlling authorities elsewhere hold, the United States has exclusive jurisdiction over the land on which the Soldiers' Home in question was erected, then the residents in that home are nonresidents of the State of Tennessee, and cannot fall within the requirements for legal voters laid down by our constitution.

It is insisted for defendants that the principles above laid down do not apply in the present case, because it is said that the "National Home for Disabled Volunteer Soldiers" is a corporation, and that a conveyance to it would not be a conveyance to the United States, hence that the land in question was not purchased by the

United States. In support of this view of the matter, we are referred to the cases of *In re Kelly* (C. C.), 71 Fed., 545, and opinion by a district judge of the United States, and *In re O'Connor,* 37 Wis., 379, 19 Am. Rep., 765. A different view was taken in the case of *Sinks* v. *Reese,* supra, and that case was approved in *Ft. Leavenworth Railroad Co.* v. *Lowe,* supra. And the same doctrine is approved in the later case of the *State of Ohio* v. *J. B. Thomas,* 173 U. S., 276, 281, 19 Sup. Ct., 453, 43 L. Ed., 699. Moreover, the members of the board of managers of the home are merely officers of the United States, subject to its control in every respect. They are together in their organized capacity merely the hand of the government in effectuating the purposes for which they were appointed. The real and only party in interest in the making of the purchase was the government of the United States.

Having stated the foregoing principles, as affecting the rights of persons who reside in the home, it is now necessary that we should apply them to certain particular classes of persons referred to, as set forth in a stipulation contained in the record in the present case.

This stipulation is in the following language:

"In this cause it is agreed that of the inmates, employees, and officers of the Mountain Branch N. H. D. V. S., which is within the physical limits of the Ninth civil district of Washington county, Tennessee, residing, living, and employed within said branch there are several classes:

State, ex rel., v. Willett.

"(1) Those who are officers, charged with and responsible for the administration of affairs of said branch, residing permanently within the same.

"(2) Employees, who are civilians and who are permanently employed at said branch, at fixed pay, and who reside and are quartered within the limits of the same.

"(3) Employees who reside in Johnson City, and the Ninth civil district and other civil districts of Washington county, Tennessee, who eat regularly and irregularly at said branch, but have homes and families on the outside, where they spend their evenings and nights.

"(4) Inmates, or as named by the rules and regulations of the home, 'members,' who work and eat both regularly and irregularly in and at said branch, but who have homes and families on the outside of said home grounds, with whom they spend their evenings and nights, and irregularly take their meals.

"(5) Inmates, or 'members,' who work for stated pay and reside within the home where they eat and sleep.

"(6)  Inmates, or 'members,' who reside, eat, and sleep within said home, but do not work."

It is further agreed "that some of all classes are natives of Tennessee, and Washington county, Tennessee, while others of all classes come from different States of the Union, and are here by reason of the existence of said branch home, to receive its benefits, having become members of the same."

We are of opinion that those falling under the para-

State, ex rel., v. Willett.

graphs numbered 1, 2, 5, and 6 fall within the opera-
tion of the principles above laid down, and that they
are not legal voters. We are of opinion, however, that
those described in paragraphs numbered 3 and 4 are
residents of the State of Tennessee, and of Washington
county, and where they have resided in the manner
stated for the length of time prescribed by the constitu-
tion, they are legal voters if they have otherwise quali-
fied themselves. We do not think that one living in
Tennessee, spending his evenings and nights at his home
with his family, would lose his citizenship and right to
vote, by taking all of his meals across the line in Ken-
tucky, or in any of the adjoining States near whose lines
he might reside.

Before passing from this branch of the case, we should
notice a point made by the defendants' counsel to the
effect that, if the clause in the Tennessee act of 1901,
concerning the voting privilege of the inmates of the
home, is void, then the whole act is void. In support
of this contention, we are referred to *Weaver* v. *David-
son County*, 104 Tenn., 317, 59 S. W., 1105, and *Jones* v.
*Memphis*, 101 Tenn., 189, 47 S. W., 138. The substance
of the decision in these cases in respect to the matter
referred to is that where a clause is so interwoven with
other portions of an act as that we cannot suppose that
the legislature would have passed the act with that clause
omitted, then if such clause is declared void, it renders
the whole act null. We do not dissent from the prin-
ciple, but we think it is not applicable to the present

case. We do not doubt that the legislature would have passed the act in question, ceding the land to the United States for the purpose of a Soldiers' Home, without the clause in question. That was intended to preserve what was supposed to be a privilege in favor of the occupants of the home. It did not affect the substance of the act itself, or its main purpose.

As to another point made by defendants' counsel, we need not do more than refer to the fact that the constitution of Kansas, and the constitutions of some other States, contain in substance a provision that for purposes of voting no one shall be deemed to have gained or lost his residence, while kept in a public, charitable institution, or other place of similar character. *Cory* v. *Spencer* (Kan. Sup.), 73 Pac., 920, 63 L. R. A., 275; *Powell* v. *Spackman* (Idaho), 65 Pac., 503, 54 L. R. A., 378; *Wolcott* v. *Holcomb,* 97 Mich., 361, 56 N. W., 837, 23 L. R. A., 215; *Re Francis A. Barry,* 164 N. Y., 18, 58 N. E., 12, 52 L. R. A., 831. There is nothing similar to this in the constitution of Tennessee.

As to the second question: Is mandamus the proper remedy?

If it should be held the proper remedy and that it could be administered without having before the court persons whose right to registration is brought in question, still, it would be impossible to apply it in the present case, because the name of not one of the persons complained of is set forth in the pleadings, or appears in the record. They are referred to merely under the

State, ex rel., v. Willett.

general designation, as residents or members of the Soldiers' Home. We have held that some of these (or, rather, persons answering to the description contained in classes 3 and 4, supra) might be properly registered, but their names do not appear, nor do the names of those improperly registered, and, if the peremptory writ of mandamus should be awarded, it would be impossible to so frame it as to communicate to the officers who would have to act under it the particular names to be stricken. An entirely new investigation would have to be made, with a view to ascertaining and setting out the names to be stricken; that is, the names of persons falling under classes 1, 2, 5, and 6, supra. The writ would, therefore, have no element of finality, and would be impossible of execution. *Webster* v. *Newell,* 66 Mich., 503, 33 N. W., 535; *Clayton* v. *McWilliams,* 49 Miss., 311; Merrell on Mandamus, sec. 42. But, aside from this consideration, even if the names appeared in the record, we could not lawfully adjudge the rights of the parties, in respect of the certificates claimed, without having them before the court. The Code (Shannon's Code, secs. 5335, 5337) makes provision for the presence of such third persons interested in mandamus proceedings, or at least for the service of notice upon them, and the offer of an opportunity to defend.

What has just been said is upon the assumption that mandamus would lie, but a careful examination of our statutes discovers no foundation for such assumption. The statutes referred to are codified in Shannon's Code,

secs. 1189 to 1219, and in Shannon's Supplement, secs. 1136 to 1377. The commissioners of election are required to appoint the registrars and are required to purchase and furnish at the expense of their respective counties, all such books, stationery, etc., to the registrars of the different wards and districts as may be necessary to the proper execution of the duties imposed, in accordance with forms to be furnished by the State comptroller.

The duties of the registrars, so far as necessary to state here, are as follows:

"Sec. 1195. It shall be the duty of said registrars for civil districts and wards, respectively, to open on the days designated herein for registration, in some convenient place in each ward or civil district affected by this article, an office for the registration of voters, and to be at their offices from 8:00 o'clock a. m. to 9:00 o'clock p. m. for the purpose of registering voters and furnishing to voters so registered certificates of such registration, who appear in their own proper persons before said registrars, and are registered by them within the hours and on the days as herein provided."

"Sec. 1197. In all the territory wherein voters are, by law, required to register, the registrars of the various wards and districts shall open the registration books on the second Monday in August, 1895, and on the second Monday of August in every second year thereafter, and the same shall be kept open for the registration of voters for ten days, not counting Sundays, and all the qualified

State, ex rel., v. Willett.

voters in said wards and districts desiring to register as voters, shall register within said ten days, in the manner registration is required by law to be made, and the registrars shall issue certificates of registration, as provided by law."

"Sec. 1200. All persons who shall have registered under the provisions of this article, and hereafter change their residence by removing to another, either within or without the ward or district where registered, shall not be qualified to vote in any election thereafter held without having first re-registered, under the provisions of this article, as much as twenty days previous to any election where he offers to vote; and the registrars, in such case, shall take up and cancel the certificate formerly issued to such voter, unless the same has been lost or destroyed.

"Sec. 1201. The registrars of the various wards and districts shall, in the manner required by law, except that no advertisement shall be necessary, open the books of the wards and districts, or either of them, for the registration of voters therein previous to any election to be held in any ward or district or precinct or voting place therein; and the books shall be kept open three days for registration, and the said registration days shall be continuous, and the books closed twenty days previous to the election; and the registrars shall, upon personal application of voters, register such voters who have not previously registered under the provisions of this

117 Tenn—23

article, and re-register those who have changed their residence.

"Sec. 1202. In all cases where the applicant for registration is not personally known to the registrars to be a legal voter in the civil district or ward in which he applies for registration, he shall, before being registered, answer and state his age, place of residence, stating district or ward, road or street, the number of his house, if numbered; and, if not numbered, then a designation of its location; if not the owner, then the name of the owner or renter, where he resides or boards, the time of his residence in said State and district or city, whether married or single, his avocation, place of business, or where and by whom employed, the State, city, or district, and post office; if a newcomer, from whence he came, and if a foreigner, when and where naturalized; has he been qualified as a voter by judgment or decree of any court; if so, when and by what court reinstated.

"Sec. 1203. The registrars shall keep suitable books in which the statements or answers of such applicants for registration shall be entered by them; and the said statements or answers shall be, when so made and entered by the registrars, sworn to by such applicant or applicants for registration; and for that purpose said registrars, or either of them, are empowered to administer said oath; and any false swearing on the part of any applicant for registration, as to the statements or answers touching his qualification to vote, as herein pro-

State, ex rel., v. Willett.

vided, is hereby declared to be perjury, punishable as perjury, in other cases under the laws of the State.

"Sec. 1204. The registrars shall number the names of voters as registered, giving the color of each voter opposite his name on the registration book, and shall furnish to each voter so registered a certificate of his registration as a voter, which shall be numbered corresponding with his name on the registration book, and shall show on its face the name of the voter, his color, the ward or district in which he resides, and that he is entitled to vote under said certificate in all elections held in the district or ward within two years from the last general registration, twenty days after the issuance of the same; and when so issued or delivered to the voter, he shall, on presentation of the same to the proper officer holding the election in the ward or district in which said voter resides, and for which said registration was held, be entitled to vote in all elections during the time the certificate shows his qualification to vote, unless, on challenge, it be shown, by proof, to the satisfaction of the judges holding such election, that the certificate was procured by fraud or perjury, or that the voter has removed from the ward or district in which he was registered; and no person shall be entitled to vote in such ward or district except on presentation of his certificate as a voter, as hereinbefore provided for.

"Sec. 1205. The registrars in each district and ward shall, immediately after the registration of voters for such ward or district is closed, keep the books of regis-

tration open for public inspection at the office of registration for the space of five days; and if any errors of a purely clerical nature are discovered during said time, the same shall be corrected by the registrars.

"Sec. 1206. On the expiration of said five days, the said registrars shall make affidavit before any officer in their county authorized by law to administer oaths, on their book of registration, immediately following the close of the list of names of registered voters, to the correctness of their registration, and that they have in all respects, in conducting such registration, complied with the provisions of this article; and any false statement made in said affidavit is hereby declared to be perjury on the part of the parties making the same, and punishable as perjury in other cases.

"Sec. 1207. Said book or books of registration, when thus completed, shall be turned over by the registrars to the commissioners of registration for their county for safe-keeping, and said commissioners shall thereafter be held responsible for the same as in case of other public records."

"Sec. 1209. At the close of each day's registration the registrars shall draw a heavy black line, in ink, immediately under the last name registered on that day, entirely across the page of the registration book, to indicate the completion of the day's registration.

"Sec. 1210. Any registrar of votes (voters) willfully refusing to register any qualified voter, shall be liable to indictment by the grand jury for a misdemeanor in of-

State, ex rel., v. Willett.

fice, and, upon conviction, shall be sentenced to pay a fine of not less than ten dollars nor more than one hundred dollars, or imprisoned in the county jail or workhouse for not less than ten or more than thirty days, or both, at the discretion of the court."

"Sec. 1212.  If the registrars disagree as to the right of an applicant to be registered as a voter, they shall register his name and issue to him a certificate as in other cases, writing across the face of the certificate the words, 'The registrars disagree,' and, in such case, the applicant may take such certificate to the board of commissioners of registration, who shall determine the question of disagreement, and indorse on the certificate the words, 'approved,' or 'disapproved,' as they may decide, and the holder of such certificate shall not be entitled to vote on such certificate unless the word 'approved' is indorsed on the same, and signed by the majority of said board of commissioners.

"Sec. 1213.  In case of the temporary absence of a duly appointed registrar on any of the days fixed for registration by this article, from sickness or other cause, he (and on his failure to do so, the commissioners of registration) shall select a person from the political party to which he belonged to act for him and in his stead during such temporary absence; and, should any duly appointed registrar willfully refuse to act on any registration day, as herein provided for, the registrar not refusing shall have power to supply his place by appointment of another registrar, to assist him, from the

same political party to which the declining member belongs, which appointment shall continue until the board of commissioners supply the place by another regular appointment: provided, that in each case an oath, the same as taken by regular registrars, shall be administered to such temporary registrars by any officer of his county authorized to administer an oath.

"Sec. 1214.   The said registrars provided for in this article, before entering upon the duties imposed upon them, shall take and subscribe to the following oath: 'I do solemnly swear (or affirm) that I will faithfully and impartially keep the register of voters in my district (or ward) ; that I will not knowingly register or allow to be registered, any person not a legally qualified voter, and that I will not knowingly prevent any person from registering who is a legally qualified voter.' "

"Sec. 1217.   On the day of any election held, the registrars for each district or voting precinct shall appear at the place of holding said election, with the books in which said voters are numbered, together with a copy of the same, which shall be evidence of registration, and they shall occupy a place inside the polling precincts, and as each voter therein registered shall vote, said registrars shall check off or mark said voter; and said registrars shall make a copy of said voters checked off, and return the same to the officer holding the election, who shall file the same with the election returns, for which service each registrar shall be paid by the county the sum of one dollar per day; but in no event shall a

failure of registrars to attend and check the voters, render void, in any instance, the election.

"Sec. 1218. In districts or wards having more than one voting place, the registrars of such district or ward shall furnish to the judges of election at such additional voting place, a certified copy of the registration list, or books, of such district or ward, and said judges shall perform the duties of registrars on the day of election, as above provided; such list shall be filed with the election returns, and made a part thereof. In checking off the name of the voter, after he has voted, the registrars or judges shall write opposite the name of the voter the word 'voted' and the number of his vote.

"Sec. 1219. The registrars shall note the fact of the death and removal of voters upon the books of their wards and districts when the facts are made satisfactorily to appear."

It is observed that no power of revision of the work done is conferred upon the registrars after the expiration of the five days (section 1205) allowed for the correction of clerical errors. After the expiration of this period the books are to be deposited with the commissioners (section 1207) for safe-keeping, and they do not again come into the hands of the registrars until the day of election, and then only for the purposes mentioned in section 1217; with the exception that they may again receive the books temporarily from the commissioners for the purpose of making the supplementary registration provided for in section 1201, or for the performance of

the duties prescribed by sections 1218 and 1219. In all this we find no power of revision in the registrars such as is required for the purposes of the mandamus sought in this case; the statutes likewise show a total absence of such power in the commissioners of election. In England, and in some of the States of the Union, special provisions upon this subject are furnished by the statutes in those jurisdictions. Paine on Elections, secs. 351-356; 15 Cyc. Pl. & Pr., p. 307; 10 Am. & Eng. Ency., p. 613. No such provision, however, as shown above appears in our statutes. The writ of mandamus cannot supply them. The writ lies to do what ought to be done and not to undo what ought not to have been done. *White's Creek Turnpike Co.* v. *Marshall*, 2 Baxt., 104; Merrell on Mandamus, secs. 42 and 43. "The writ of mandamus never creates any new authority, nor does it confer a power which did not exist before. It does not make duties, but lies to compel a party to do what is his duty without the writ." Id., sec. 50. In the case cited from 2 Baxt. it is said: "A mandamus cannot be granted where it would be unavailing, for the want of power in the defendants. . . . If the defendants have exercised the power vested in them, and have not the right and power to review their own acts and undo them, the writ should be refused as vain and fruitless." In *State* v. *Miller*, 1 Lea, 596, 606, 607, it is said: "The case must be one where, at the time the mandamus issued to the officer or inferior tribunal, the officer is in condition to comply with the mandate; the case must be still

before the judge, if it be directed to a judicial officer for adjudication; if to a ministerial officer, it must be where he is under obligations at the time to perform the act sought to be accomplished."

The writ of mandamus must therefore be denied in this case.

Our election laws, we feel bound to say, would be in a deplorable state, if they provided no means for the correction of the unlawful padding of registration lists, such as we see in the present case. They do, however, provide a remedy. In section 1204, supra, it is provided that it shall be a ground of successful challenge at the polls if it be "shown by proof to the satisfaction of the judges holding such election, that the certificate was procured by fraud or perjury." If the registrars, say at Bristol, should admit to registration nonresidents, people just over the line, residents of Virginia, it would be no less a fraud upon the elective franchise, if both the registrars and such nonresidents were aware of the fact of the nonresidence. So, if the registrars at Johnson City admitted to registration, either knowingly or ignorantly, people residing in the Soldiers' Home, who are as truly nonresidents of the State as persons living in Virginia or Kentucky, that would be a fraud— a fraud in law, if done ignorantly, a fraud in fact, if done with knowledge on the part of either the applicant, or of the registrars, and the fraud would be intensified if meditated by the applicant and connived at by the registrars. In either event it would be a ground of chal-

lenge under section 1204, which it would be the duty of the judges of election to entertain.

A different construction of the statutes would place it within the power of evilly-disposed persons in border counties, just prior to our recurring elections, to load the registration lists with the names of nonresidents, who, armed with certificates of registration, would have an unimpeachable title to the ballot, with the result that the citizens of the State would be compelled to witness the corruption and prostration of the elective franchise without power of prevention or correction.

The peremptory writ of mandamus must, however, be denied in the present case, on the grounds already stated.