291 P.2d 400

**B. R. PARKINSON and Robert C. Poe, Plaintiffs and Appellants,**

**v.**

**Edward H. WATSON and Ray P. Greenwood, Defendants and Respondents.**

**No. 8407.**

Supreme Court of Utah.

Dec. 8, 1955.

---

Peter W. Billings, H. Wright Volker, Salt Lake City, E. R. Callister, Jr., Atty. Gen., David K. Watkiss, H. R. Waldo, Jr., Salt Lake City, for appellants.

A. W. Sandack, J. Lambert Gibson, Salt Lake City, Richard C. Howe, Murray, for respondents.

Mari D. Gibson, Price, Orval Hafen, St. George, amici curiae.

CROCKETT, Justice.

This is a declaratory judgment action brought to determine the validity of an act reapportioning the Utah Legislature, enacted by the 1955 Session.[1] Plaintiffs are two members of the Salt Lake County Redis-

---

1. Laws Utah 1955, c. 61, now contained in U.C.A.1953, 36–1–1 through 36–1–4.

tricting Committee, appointed pursuant to the Act, and the defendants are the other members of said Committee and other named public officials concerned with its operation.

The Act reapportions the House of Representatives on the basis of one representative for each 13,000 population or major fraction thereof, provided that each county is given one representative, as required by the Constitution.[2] With respect to the Senate, it provides for a revision of certain of the state senatorial districts, and further, in the districts entitled to more than one senator, for the subdividing of the district "as near equal in population as practical" so that senators will be elected from a given area rather than from the district at large. No fault is found with the foregoing provisions, but it is the formula for determining the number of senators from each district that is challenged.

The charge of unconstitutionality is leveled specifically at the use of the "double ratio" for determining representation in the Senate as provided in Section 36–1–1:

"Representation in the senate of the state shall be on a basis of one senator for the first nineteen thousand inhabitants, or major fraction thereof, and one additional senator for each additional fifty-five thousand inhabitants, or major fraction thereof, residing within the senatorial district. * * *" Laws Utah, c. 61, § 1.

Defendants point out that the use of this "double ratio," allowing each district one senator for 19,000 inhabitants, or major fraction thereof, but requiring 55,000, or major fraction, for each additional senator, was devised for the express purpose of avoiding representation in true proportion to population; that thus giving each of the smaller senatorial districts at least one senator results in disproportionately large representation for the rural areas of the state and deprives the more populous, urban areas, referred to as the "Wasatch Front" counties, that is, Weber, Salt Lake, Davis and Utah, of their fair share of senatorial representation.[3] This, they contend, is contrary to the principle of representation based on population, which they aver is inherent in our form of representative government. They point to the abuses and inequities in representation which arose in England under the notorious "Rotten Borough" system, which gave rise to the great parliamentary revolution and readjustment of representation based more nearly on population; and call attention to the constitutions of the various states of the United States, which have quite generally set up plans of representation in proportion to population as nearly as practicable.

2. Utah Const. Art. IX.

3. Davis County regarded as urban since influx due to World War II industrialization.

The controversy here devolves upon the language of Article IX, § 2, of the Constitution of Utah:

"The Legislature * * * at the session next following an enumeration made by the authority of the United States, shall revise and adjust the apportionment for senators and representatives on the basis of such enumeration according to ratios to be fixed by law."

Defendants insist that the only reasonable import of the language requiring the legislature to revise the apportionment of senators and representatives *on the basis of such enumeration* is that representation should be in direct proportion to the population as found by such enumeration except only for the departure from that principle in allowing each county at least one representative in the House. Consequently, they urge that the Act is in arbitrary disregard of the constitution.

On the other hand, it is plaintiffs' position that the legislature has plenary power to apportion the legislature in any manner it deems proper within the confines of the Constitution, so long as it is not in direct conflict therewith; that there is no requirement, express or implied, that representation be either equal, or in any single mathematical ratio to population; that therefore it was free to set up the basis of representation contained in the Act because that comported with its judgment as to what would best serve the interests of the state.

The question as we see it is whether this Act represents a bona fide attempt to carry out the constitutional mandate by devising a reapportionment of the legislature within its framework, in which case it must be upheld; or is an attempt to reapportion the legislature of the state in arbitrary disregard of the requirements of the Constitution, in which event it would be invalid.

In view of the controversy here, in which each of the respective parties contends that the language of Section 2, Article IX, expresses the meaning they contend for, leading to diametrically opposite results, we look not only to the language itself, but to its historical antecedents, the discussions of the Constitutional Convention leading to its adoption, and to the subsequent practical interpretation placed upon it, for guidance in seeking a solution to the problem.

The difficulties in securing enactment of reapportioning legislation have been such that, notwithstanding the directive that it be done following each federal census, only three such acts have been passed since Statehood, and the 1955 Act is the first since 1931. It is the culmination of efforts made during each regular legislative session since 1941, a total of 20 bills having been introduced in attempting to comply with that requirement. This failure is not chargeable to partisanship of the major political parties, as each has controlled various of the legislative sessions during that period. Rather it seems to have been due to the refusal of representatives of the rural

areas, which had a majority, 31 to 29 in the house and 12 to 11 in the senate, to agree to any reapportionment of the senate on a strictly population basis,[4] which would have vested control of both houses of the legislature in the "Wasatch Front" urban counties.

After further abortive attempts in the 1951 session, the conflicting bills were referred to the Legislative Council. The Council suggested several possible compromises. A bill patterned upon its report, and another compromise bill were introduced in the 1953 session. Again neither of these proved palatable to the rural interests of the state. Upon the legislature's failure to agree in that session, a resolution proposing a constitutional amendment was passed, submitting the matter to the people in the 1954 election. It would have given each county one senator regardless of size, and although it carried in 23 of the 29 counties of the state, it was rejected by an overwhelming majority of the popular vote. Finally the opposing interests resolved their differences by adopting the 1955 Act, under review here.

▮▮ In addressing attention to the arguments of the respective parties in regard to the constitutionality of this Act, there are two cardinal principles to be kept in mind. The first relates to the attitude and the prerogative of the court in appraising legislation under such an attack. It is of paramount importance to remember that the constitutional mandate is addressed, not to the courts, but to the legislature, whose responsibility it is to carry it out. The legislature having performed its function, if we are obliged to review it, we must do so with the highest possible degree of understanding of the multifarious problems the legislative process is fraught with, including the makeup of the legislature and its variety of interests. It must be realized that there is plenty of room within the framework of the Constitution for legislation with which we might not agree, were we legislators.[5] It is a rule of universal acceptance that the wisdom or desirability of legislation is in no wise for the courts to consider. Whether an act be ill advised or unfortunate, if such it should be, does not give rise to an appeal from the legislature to the courts.[6] But the remedy for correction of legislation remains with the people who elect successive legislatures.[7]

▮ Guided by those principles and in conformity with the pattern set historically by the courts of this country, it has always

4. This seems generally true but the alignment on this issue does not appear to have ever been exactly on such basis.

5. Hansen v. Public Employees Retirement System Bd. of Adm., Utah., 246 P.2d 591, 599.

6. Kimball v. City of Grantsville, 19 Utah 368, 57 P. 1, 5, 45 L.R.A. 628, quoted with approval in Hansen v. Public Employees Retirement System Bd. of Adm., supra.

7. See Ashton-Jenkins Co. v. Bramel, 56 Utah 587, 192 P. 375, 11 A.L.R. 752.

been and now is the responsibility of this court to be extremely reluctant to interfere with enactments of the legislature. This reluctance stems in part from the peculiar and awesome power which reposes in the courts. Under our system they are permitted to determine not only the scope of their own function, but when judicial review is invoked, are required to adjudicate the limitations upon the authority of other departments of government. We are conscious of how important it is for the three branches of government to operate independently in the full use of the powers vested in them, in proper relationship to each other and to the entire structure of government, and of the hazard of impairing that wholesome ingredient in our body politic the balance of power.

We believe that the fact that American courts have been constantly wary not to trench upon the prerogatives of other departments of government or to arrogate to themselves any undue powers, lest they disturb the balance of power, has contributed greatly to the success of our system of government and to the strength of the judiciary itself. In that spirit we approach evaluation of this important legislation with a sense of serious responsibility.

■ The second such cardinal principle is closely related to and finds its roots to a large extent in the one just discussed above. Its purport is that all doubts should be resolved in favor of constitutionality.[8] Whatever the correct quantum of proof or persuasion may be, or whatever may be the best way to express it, this at least, can be stated with assurance: no act should be declared unconstitutional unless it is clearly and palpably so.[9]

The Utah Constitution is substantially different from those of most of the older states of our Union in the east, which generally provide either that reapportionment proceed on the basis of an "equal number of inhabitants" per district, or that the districts be as "equal in population as may be."[10] Accordingly, cases decided relative to such constitutional provisions, cited by defendants, have no application to our in-

---

8. Newcomb v. Ogden City Public School Teachers' Retirement Commission, Utah, 243 P.2d 941. See Norville v. State Tax Comm., 98 Utah 170, 97 P.2d 937, 939, 126 A.L.R. 1318 ("The court is bound to choose that interpretation which would uphold the statute * * *.") ; Tintic Standard Mining Co. v. Utah County, 80 Utah 491, 15 P.2d 633, 636 ("Courts will not declare a statute unconstitutional unless it clearly and manifestly violates some constitutional provision."); Stillman v. Lynch, 56 Utah 540, 192 P. 272, 278, 12 A.L.R. 552 ("Every doubt as to the constitutionality of a statute must first be resolved in favor of its validity, and * * * before a statute can be declared invalid the repugnancy between the statute and the Constitution must be entirely clear. * * * *")

9. Highland Boy Gold Mining Co. v. Strickley, 28 Utah 215, 78 P. 296, 1 L.R.A., N.S., 976.

10. The cases collected in Annotation, 2 A.L.R. 1337 generally are cases construing such provisions.

quiry. The experience of our neighboring western states, which do have constitutional provisions similar or closely related to our own, are a more fruitful source of counsel to us touching the problem at hand. In regard to them it is significant to note that a survey of the constitutions of the 10 other western states [11] indicates that equality of representation is not the general rule, but in nearly all, rural areas are given special recognition. In only two of them, Oregon and Washington, is representation in both House and Senate solely on population. In Nevada, while the Constitution recites that population shall be the basis for representation in both houses, their 1951 reapportionment act provides for one senator from each county.

During the twenty-year period from 1876 to 1896, three of our western neighbor states and Utah adopted constitutions using the phrase "ratios to be fixed by law" in speaking of reapportionment. The first of these, Colorado, is identical in wording to our own in that regard.[12] It was adopted in 1876. It required reapportionment following the federal decennial census. In 1881 and again in 1891, the legislature reap-

portioned on the basis of a double ratio.[13] Though this has not been subjected to a frontal attack in court, it has been approved, impliedly at least, by the Colorado Supreme Court. In Armstrong v. Mitten,[14] the issue was presented as to whether a legislative reapportionment or a prior reapportionment act instituted by initiative should be sustained. Both used multiple ratios. By sustaining the initiative act, the Colorado Supreme Court recognized the validity of the multiple ratio.

Wyoming adopted its constitutional provision, patterned after the Colorado Article, in 1889.[15] The 1901 legislature established ratios for the Senate of one senator per county and one additional senator for each fraction over 3,500.[16] In the only case in that jurisdiction involving such constitutional provision, the question of multiple ratio does not appear to have been made an issue, and the court made no comment as to impropriety of the act.[17]

The Montana Constitution, also adopted in 1889, contains a variant of the Colorado and Wyoming provisions.[18] It gives each county one senator and apportions only the House of Representatives "on the basis of

---

11. I. e., the states of Arizona, California, Colorado, Idaho, Montana Nevada, New Mexico, Oregon, Washington and Wyoming.

12. Colo.Const. Art. V, § 45.

13. Laws Colo.1881, p. 20 set up a ratio in the Senate of one senator for the first 5,000; one for each 9,000 thereafter, and one for each fraction under 7,000. The proportions were changed in 1891 to

one senator for each 8,000; one for each 20,000 thereafter, and one for each fraction over 15,000. Laws Colo. p. 22, § 2.

14. 95 Colo. 425, 37 P.2d 757.

15. Wyo.Const. Art. III, § 48.

16. Laws Wyo.1901, c. 91, §§ 2, 3.

17. State ex rel. Sullivan v. Schnitger, 16 Wyo. 479, 95 P. 698.

18. Mont.Const. art. 5, § 4; art. 6, § 2.

such enumeration according to ratios to be fixed by law." The Montana provision clearly permits a multiple ratio in the House and recognizes area interests in the Senate. At the Utah Constitutional Convention, delegates had before them both the Colorado wording—which they selected—and the Montana version.[19] If the delegates had wanted to provide different schemes for setting up the two houses—a purely population consideration for one and area representation for the other, for example—they could more easily have accomplished this purpose by patterning our apportionment provision after the specifically worded Montana provision, rather than the more generally worded Colorado version, the uncertainty of which gives rise to this suit.

■ We have then a situation in which three constitutions—those of Wyoming, Colorado and Utah—used identical wording, and in two states this wording had been interpreted by practical legislative construction to permit a double ratio. And such acts had not been declared invalid by their courts. Although the practical construction of the Colorado and Wyoming legislatures did not become a part of our law in the sense that statutes adopted from sister states are presumed to have been

adopted along with the interpretation given by that state, nevertheless the legislative construction and policy followed in operating thereunder may be taken as advisory as to what was intended by the framers,[20] and help constitute the history to which we may look in interpreting the meaning of this provision.

■ It is plainly apparent from the discussions in our own Constitutional Convention that they proceeded upon the assumption that the Convention had full power to determine the basis of representation in the state legislature, and that the state legislature would succeed to such power except as to such restrictions as the Constitution should specifically prescribe. This is so, because of the well recognized principle that in state governments, the legislature being the representatives of the people, wherein lies the residuum of governmental power, constitutional provisions are limitations, rather than grants of power.[21] That was the reason for the grave concern and extensive debates upon the pattern to be set for representation of the various areas in the State and future reapportionments thereof.

The delegates were certainly not oblivious to the possibility that problems such as

19. In the Constitutional Convention delegates refer constantly to constitutions of other states and mention specifically the Montana Constitution. I Proceedings of Constitutional Convention 823–850, passim.

20. E. g., People ex rel. Woodyatt v. Thompson, 155 Ill. 451, 40 N.E. 307, 314; State ex rel. Attorney General v. Cunningham, 81 Wis. 440, 51 N.W. 724, 15 L.R.A. 561.

21. People ex rel. Woodyatt v. Thompson, 155 Ill. 451, 40 N.E. 307, 312.

the present one might arise, in fact seemed almost too alive to the potential conflicts of interests between the rural and urban areas. The matter was brought sharply into focus by the proposal of Mr. C. S. Varian of Salt Lake County, when he moved an amendment that would strike the provision granting one representative in the House to each county. The entire import of the debates on that proposition related to representation in proportion to population as against recognition of the more sparsely settled areas on a geographical basis. This question as to how urban—rural interests could be properly balanced and protected was among the most thoroughly discussed and considered by the convention. It was clearly contemplated that such matters would properly commend themselves to the attention of legislators in subsequent reapportionments. The Varian motion lost and the provision allowing one representative for each county, regardless of population, was retained, thus giving approval to the idea of area representation.

The same ideas underlay the debates relating to representation in the Senate. The division of the state into 12 senatorial districts, the provision that counties in such districts must be contiguous, and that they could not be divided for formation of senatorial districts unless the new subdivisions would be sufficient in themselves to form a district, all relate to the concept of area representation. It is true that the purpose in forming the districts appears to have been to allocate representation in as nearly equal proportions to population as possible. But, considered solely on a population basis, the districts thus formed showed considerable disparity in representation. For instance, in the 12th district, representation was on the basis of one senator for 18,291 inhabitants, while in the 3rd district, it was one senator for 11,987 inhabitants.[22] It seems indisputable that this was a recognition by the constitutional convention itself of the impracticability of representation on exactly mathematical proportions and that the matter of area must also be given some consideration. As will hereafter appear, the fact is that generally similar disparities in Senate and House have continued down to the present time.

Returning our attention to defendants' argument based on the specific language of Section 2 of Article IX, we, of course, do not disagree with defendants' statement that the whole must be considered in context. They urge that in connection with the directive "shall revise and adjust the apportionment * * * *on the basis of such enumeration* according to ratios to be fixed by law", if meaning is to be given the emphasized phrase, the only reasonable construction of the language is that the ratio of representation should be in direct proportion to the number of inhabitants found in such enumeration; and that "according to ratios to be fixed by law" means

22. 1900 Federal Census data.

a single ratio for each House, it being necessary to use the plural "ratios" for grammatical accuracy. Whereas, the plaintiffs maintain that the plural means any number of ratios the legislature may fix.

It is to be observed that as a matter of actual semantics, there is no gradation in the plural—"ratios" means any number greater than one. Therefore, it could with equal reason be understood as the indefinite plural and thus not limited to two ratios, one for each House, but could well mean any number of ratios more than one. Further, it seems that if the matter were to be settled as simply as upon a single mathematical ratio of representatives in proportion to the number of inhabitants as found by the census, that this could have been accomplished by putting a period and terminating the sentence after the word "enumeration" in the language above quoted, or merely by stating according to "a separate ratio" to be established by law for each House.

In that regard it is significant to note that the amendment to Article IX above referred to, proposed by Mr. Varian, contained the following:

"* * * provided that in any apportionment the legislature shall apportion representatives and senators upon a basis of an enumeration of the people according to *the ratio* to be fixed by law." [23] (Emphasis added).

which was rejected along with the defeat of his amendment. The Convention thus not only had its attention called to the singular wording as just noted, but as above delineated, was aware of a long history of difficulties in apportioning representation in legislative bodies in other states, including the not inconsiderable disputation in the Convention itself.[24] Thus, fully advised of the foregoing considerations, the Convention, following the phrase "on the basis of such enumeration" added the words "according to *ratios* to be fixed by law" and nowhere used any words expressly stating that representation should be "equal" or "in direct proportion to" the inhabitants or limiting it to a single ratio.

■ Should it be conceded for the purpose of discussion that the meaning contended for by defendants is one reasonable construction to be placed upon the language in question, it can also be said that the interpretation espoused by plaintiffs, particularly in view of the practical interpretation which has been placed thereon, is not unreasonable. The constitutional provision does recite that the House must be weighted in favor of area by giving at least one representative to each county, but it does not contain any express prohibition against some recognition of area in the Senate. It cannot be said that the establishment of more than one ratio for the Senate would be in direct conflict with the language we

23. Vol. I Proceedings of Constitutional Convention, 831.

24. Ibid., pp. 823–850 passim.

are discussing, nor that doing so does such violence to the plain import of the entire context as to appear wholly unreasonable. This is particularly so because of the policy of giving the Constitution a liberal construction,[25] inasmuch as it relates to an original and unlimited power. This is well stated in 11 Am.Jur.Const.Law, Sec. 51:

" * * * courts are not inclined to adopt such a technical or strained construction as will unduly impair the efficiency of the legislature to meet responsibilities occasioned by changing conditions of society."

In support of their argument that the inequalities of representation under the present act are so extreme that it represents an attempt to avoid the principle of representation based on population, and hence, must be struck down, defendants point out numerous substantial inequalities of representation resulting therefrom; plaintiffs counter that actual equality of representation never has existed, cannot exist and was never intended, pointing to disparities of a generally similar nature as fixed by the Constitution itself and subsequent reapportionment acts. They place particular emphasis on the 1931 Act, Laws 1931, c. 32, and the fact that because of the unusual growth of the urban areas of the State since 1931, nullification of the present act would cause even more gross inequities in representation by reverting to it.

It is indeed true that neither in the scheme of representation fixed by the Constitution, nor in any plan since has representation been in true mathematical proportion to population. At statehood, the populous counties—Salt Lake, Weber and Utah, had 49 per cent of the population, but in the House of 45 members, had only 18, or 40 per cent representation, whereas, the rest of the state had 27, or 60 per cent of the membership. In the Senate of 18 members, control was divided equally between rural and urban counties—each having nine seats. The Convention adopted this scheme of representation well knowing that as a practical matter, it had the effect of conferring a definite measure of control in the rural districts, because the urban areas did not have a majority and rural members would have to give approval before any new reapportionment act might become law.

The same weighting of representation in favor of outlying areas was continued after the 1920 census. The urban counties then had 54% of the state's population, yet the 1921 reapportionment act gave the rural counties control of the House of 55 members by alloting 31 seats, or 56 per cent, to the 24 given the populous areas. The Senate remained divided nine to nine.

25. " * * * a case [situation] falling within the words of a constitutional provision must also be within its operation, unless there is something in the literal construction so obviously absurd, mischievous, or repugnant to the general spirit of the instrument as to justify an exception." 11 Am.Jur., Const.Law, Sec. 59, citing Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 4 L.Ed. 629.

By 1930 population of Salt Lake, Weber and Utah Counties had climbed to 58 per cent of the state, but by the 1931 Act the rural areas retained control of the House of 60 members with 31 seats going to these outlying counties and 29 to the urban ones. That act also gave these outlying areas control of the Senate by a proportion of 12 to 11.

■ The 1950 census shows that the urban counties had a still greater majority, 68 per cent of the state's population, yet the act fails to give them additional representation in the Senate, allowing them only to retain their 11 seats, while the rural areas increased from 12 to 14. Numerous substantial inequalities of representation in various senatorial districts are pointed out. Perhaps the most extreme facet of ·this is the fact that Salt Lake County, which had a population of 194,102 in 1930, was in the 1931 Act given seven senators, and had increased to 274,895 in 1950, but in the present Act was reduced to six. We will not burden this opinion with other disparities, except to recognize that they do exist, and that it in truth may require some rationalizing to justify them under the principle of representation based on population. There are two observations to be made in respect thereto. First, the court is not the legislature and can nullify the Act only if it so far departs from that principle as to be wholly unreasonable and arbitrary. Second, the numerical comparisons made by defendants should not be considered in isolation, but must be viewed in relation to the entire picture of representation in both houses and against the background of the history hereinabove discussed, which indicates that, as a matter of practical operation, in addition to population, the area factor comes in for at least some consideration.

In surveying the situation under the present Act, it is to be observed that in the House, now increased from 60 to 64 members, the urban counties are, in a measure, compensated for their relatively weaker position in the Senate by gains in the House which have been brought more nearly into line with population increases. For example, Davis County, which has more than doubled in population, while under the 1931 Act had only one seat; its new urban status is recognized by an additional seat in the House. Similarly, representation of Utah and Weber Counties has been increased from five representatives each to six, and Salt Lake County is allotted 21 representatives instead of the 19 under the 1931 Act, so that in the House, now increased from 60 to 64 members, the urban counties for the first time have a majority, 35 to 29 seats.

It seems worthy of comment in passing that the present act is being subjected to the first court action brought against an apportionment act in this State; and this, based upon a claim that it favors the rural areas, when the fact is that the urban areas have never had control of either House until this Act, which gives them a majority in the House of Representatives.

The burden of defendants' argument goes somewhat beyond merely pointing out inequalities resulting from the 1955 Act as compared with prior plans of apportionment. They urge upon us that once the principle of "double ratio" is sanctioned, under the Constitution, dire consequences may result. It is indeed conceivable that it could be used to depart from representation in proportion to population. But this could also result from the use of a single ratio. By using it, if the legislature set about to do so, it could certainly contrive various bases of numbers and/or districting which would result in grossly disproportionate representation. The real question is not whether a single or a double ratio is used, but whether the Act is consistent with the basic and important principle of representation proportioned to population, as contemplated by our constitutional framers, or is so totally inconsistent therewith that it must be struck down. We do not share defendants' anxiety that approval of the present Act will necessarily result in gross distortions of the concept of representation in proportion to population. As presently constituted, neither urban nor rural interests have a majority in both Houses, so that neither group could arbitrarily impose its will upon the other by passing an apportionment act which would be entirely unfair in correlation of representation to population, even if it should so desire. Each House serves as a check against the other, resulting in a balancing of power within the legislature itself. It is to be observed that a new act will be due following the 1960 Federal Census, and that the urban interests, who now complain of inequality, will be in no worse position, but in fact a better one, than in previous sessions to see that their interests are properly safeguarded in subsequent reapportionments. A further protection against the forebodings of defendants is to be found in what we believe is a justifiable assumption that legislators may be assumed to be both rational and fair-minded in approaching the problem of reapportionment, and that they will do so with a sense of commitment to the indisputably correct principle that in our democratic form of government there should be fair representation based on population insofar as that can practically be accomplished.

We do not desire to be understood as departing from this basic precept: that the theory underlying our system of representative government, and our Constitution upon which it rests, presupposes that there must be reasonable correlation between representation and the number of inhabitants represented. But this principle is not absolute and of necessity cannot be, because practical exigencies require that it be modified by giving some consideration to area representation.

The conclusion we reach herein finds support in respectable judicial authority based on similar considerations. In approving an act against the charge of inequality of rep-

resentation, the Supreme Court of Wisconsin aptly said:[26]

"The whole scheme of the statute must be taken into account, and not isolated instances where the Legislature has fallen short of a perfect result. * * * This court cannot ignore the fact that the enactment of such a law presents practical difficulties, arising from the necessity that it secure the approval of both houses of the Legislature."

A similar sentiment was expressed by the Michigan Court:[27]

"Exact equality in population between representative districts or even a close approximation thereto has never been accomplished nor is it possible to accomplish it under the Constitution and physical conditions existing in this State."

The New York Court made this pertinent comment:[28]

"It will pass the wit of man to make such an alteration of the senate districts for this state that may not be the subject of adverse criticism, and of alleged possible improvement."

It is plain to be seen that the expressions just quoted reflect our own experience. We are likewise constrained to believe that inasmuch as the numerous attempts to reapportion in this State have encountered extreme difficulty because of the varying geographic, social and economic interests, there is reason to doubt that any plan of representation could be agreed upon which would be very much better in regard to equality in representation than the present one.

██ In summary: we are in entire accord with the thought that the language of the article in question must be considered altogether, and that the "ratios to be established by law" must be correlated to the enumeration to preserve the principle inherent in our form of representative government that the allocation of representation must bear reasonable relationship to population. Looking at this enactment in the light of the various considerations, hereinabove discussed, bearing upon the question of its validity, it does not appear to us that the plan of representation it sets up is such an unreasonable departure from the principle of representation based on population, as intended by the framers of our Constitution, that it can be regarded as an attempt to effect an apportionment in arbitrary disregard of its requirements. Therefore, it is not such as to impel us to overcome our obligatory reluctance to interfere with the legislative prerogative.

Consequently, the Act is declared valid.

26. State ex rel. Bowman v. Dammann, 209 Wis. 21, 243 N.W. 481, 485.

27. Stenson v. Secretary of State, 308 Mich. 48, 13 N.W.2d 202, 207. See also People ex rel. Woodyatt v. Thompson, supra.

28. People ex rel. Carter v. Rice, 135 N.Y. 473, 31 N.E. 921, 930, 16 L.R.A. 836.

■ This litigation was initiated and has been carried on in the public interest by the parties on a friendly, non-partisan basis for the purpose of testing the validity of this Act, as we are assured by respective counsel, who, including bi-partisan members of the Legislature as amici curiae, have done an excellent work in assisting the court. In view of such facts no costs are awarded.

WADE, J., concurs.

HENRIOD, Justice (concurring).

I concur. I believe, all else aside, that the apportionment effected, imperfect as it is and unproportional as to population as it may be in isolated instances, nonetheless reasonably is bottomed primarily upon representation according to population, with reasonable respect being paid, however, to the geography factor. The language of the Constitution in my opinion, allows for necessary, but reasonable distortion of the per capita representation philosophy which it contemplates, in favor of area or geography. Had the legislature gone much further in departing from a precise mathematical representation based on noses to be counted, this writer is constrained to feel that constitutional interdictions would have been ignored. I am convinced that one effectively could demonstrate that to use any single ratio that might be proposed, would lead to as much disparity of representation as the formula used in the reapportionment act of 1955, due, perhaps, to the kaleido-

scopic nature of population concentrations, county arrangements and economic divergences. Besides, what may be called a "single" ratio, becomes a "double" ratio when representation is based on any definite number of people "or major fraction thereof," which as a practical matter, it must be.

Applying those principles of constitutional government enunciated by Mr. Justice CROCKETT anent remaining in our own sphere unless the legislature clearly has done something that reasonably cannot be construed as being an authorized act within the meaning of the constitutional language, it is my opinion the apportionment act passed by our last legislature must be sustained.

WORTHEN, Justice (concurring).

I am in agreement generally with the views set out in the opinion of the court and agree that the Act is constitutional. However, the plaintiffs sought a determination of the duties of the Redistricting Committee provided for in Chapter 61, Laws of 1955, as well as the determination of the constitutionality of the Act.

Since the trial court determined the Act unconstitutional because of the use of the double ratio, and because it was arbitrary and capricious, it did not pass on the issues as to the validity of the provisions therein as to the appointment of the Redistricting Committee and their powers and functions thereunder, for the reason that the same were moot. This being a declaratory judgment action, its purpose is to settle and af-

ford relief from uncertainty and insecurity with respect to the duties of the Redistricting Committee which should be accomplished with expedition.

I am of the opinion that the case should be remanded to the trial court with instructions to make a determination of the other matters which would undoubtedly have been decided had the trial court concluded that the Act is constitutional.

McDONOUGH, Chief Justice (dissenting).

The question which to the writer is decisive of the problem here confronted is: Does a reasonable construction of Article IX, Section 2 of the Constitution of Utah authorize the use of multiple ratios as the basis for apportioning representation in the House of Representatives and the Senate of this state? If this question be answered in the affirmative, the question of whether, nonetheless, the legislature acted so arbitrarily in enacting Chapter 61, Section 36–1–1, Laws of Utah 1955, as to violate the basic concept of representative government embodied in our fundamental law may challenge consideration. The question posed is thus stated because, while in the reapportionment act of 1955 a double ratio was employed in reapportioning only the Senate, if the word "ratios'" in the provision authorizes the use of multiple ratios in relation to apportionment of senate seats, it necessarily has the same application in apportionment of seats in the House.

It should also be observed, at this point, that if a double ratio may be employed under the constitutional provision in question, a triple or quadruple ratio may likewise be used.

Because I believe that the use of a multiple ratio in apportioning seats in either or both of the legislative branches contravenes the clear meaning of Article IX, I shall confine this opinion to the reasons which impel me to this conclusion and shall refer to the question of arbitrariness only to the extent that doing so may shed some light on the question.

The writer is in complete accord with the opinion of the court insofar as relates to the criteria which should govern the judicial branch of our government in passing upon legislative enactments.

But strict adherence to such criteria should not cause us to forget that it is not our mere prerogative but our duty to construe the language of our state charter. It is our task to determine the intent of the framers of that document. True, as quoted in the court's opinion, in gleaning that intent from the language used, we should not "adopt such a technical or strained construction as will unduly impair the efficiency of the legislature to meet responsibilities occasioned by changing conditions of society." However, no strained construction is here indulged. Furthermore, we are not dealing with a broad or vague provision of the document, nor with some changed condition of society or some emergency which

could not be visualized by the delegates to the Constitutional Convention. Indeed, no one can read its proceedings without being advised of the fact that its able members were acutely aware of the prospective growth of the state and of the increasingly greater concentration of its population in urban centers, an anticipated development which was frequently spoken of on the floor of the Convention in words of inspiring optimism.

The conscientious but fruitless efforts made by the several sessions of the legislature which have sat since the promulgation of the 1940 census enumeration, and delineated in the opinion of the court, would constrain the writer to join in such opinion were it not that studied consideration of the constitutional provision under scrutiny, leads to conviction that the apportionment basis adopted by the 1955 legislature does violence to the mandate thereof.

This conviction is impelled by: (1) The wording of Article IX, Section 2, considered in its context and in light of the underlying concept impregnating the document as a whole: the establishment of a truly representative government. (2) The discussion and debate attendant upon the adoption of the Article. (3) Constitutional and statutory construction thereof.

Section 2 of Article IX reads:

"The Legislature shall provide by law for an enumeration of the inhabitants of the State, A.D.1905, and every tenth year thereafter, and at the session next following such enumeration, and also at the session next following an enumeration made by the authority of the United States, shall revise and adjust the apportionment for senators and representatives on the basis of such enumeration according to ratios to be fixed by law."

Construing the word "ratios" employed in the last phrase of the section as meaning a ratio for apportioning senators and a ratio for apportioning representatives, its employment is grammatically and logically correct. Indeed, when the provision which requires that the number of senators shall never exceed more than half the number of representatives is borne in mind, necessitating that there be a different ratio employed as a means of apportioning senators than that for apportioning representatives, its use in expressing the intent suggested is natural, reasonable and logical. If, however, it be conceded that the phrase removed from its context is reasonably susceptible of a different construction, the ambiguity thus revealed is resolved by reading it in the sentence in which it is employed. The single sentence which encompasses the whole of Section 2, first provides that in 1905, and every tenth year thereafter, the legislature shall provide by law for an enumeration of the inhabitants of the state. It then requires that at the session of the legislature next following such enumeration and also at the session next following the enumeration made by the United States, the apportionment for senators and repre-

sentatives should be revised and adjusted "on the basis of such enumeration". Thus it was contemplated that house and senate seats be reapportioned by the legislature every five years. To what end? Obviously, so that any change in the population of a county or group of counties revealed by such enumeration would be reflected in the reapportionment devised. If this is the intent expressed, it is submitted that no change in the number of geographical distribution of inhabitants of the state could occur which would not be directly reflected in reapportionment made by employing a single ratio for the house and a single ratio for the senate.

On the other hand, the use of a multiple ratio for either or both houses defeats the attainment of that end. And the wider the discrepancy between the number of inhabitants required for the first legislative member and that required for those in excess of one, the more gross is the deviation from the objective visualized by the drafters of the instrument.

If in fact the Constitutional Convention, by the use of the word "ratios," intended that multiple ratios be sanctioned, it must have been motivated by a desire to vest in the legislature the authority to apportion seats without regard to the number of inhabitants represented by each seat. Such, it is submitted, was palpably not the intent of the delegates to that body. Indeed, the opinion of the court espouses no such doctrine, but concedes that the Constitution re-

quires that reapportionment be made as near as may be reasonably practicable on the basis of population. The writer is convinced, however, that to approve the use of multiple ratios is to permit not merely deviation from that concept but its emasculation. The very results attained by the employment of this device by the last session of the legislature are eloquent of that fact. The opinion of the court states that a single ratio for each house could be used in such manner, if the legislature set about to do so, as to result in grossly disproportionate representation. Of course it could, if the legislature paid no attention to the concededly basic principle leavening the whole of Article IX, and this court stood mute. But it requires no mathematical acumen to demonstrate that the potential of distortion is infinitely greater if a multiple ratio be used.

It may well be asked when may a reapportionment be held to be arbitrary if the Constitution permits the use of multiple ratios? What criterion may be used in the future to determine whether the legislature abused its discretion if there is conferred upon that body the power to give control of at least one house to perhaps increasingly smaller segments of the population?

The discussion and debate in the Constitutional Convention fortifies, in the opinion of the writer, the construction here espoused. There was no debate on Section 2 on the Convention floor, except as to that portion requiring an enumeration of inhabitants by the state, which provision, after dis-

cussion, was retained. The debate was on the provision of Section 4, which provided that every county have at least one representative. The amendment to Article IX proposed by Mr. Varian and quoted in the opinion of the court was an amendment to Section 4, not to Section 2. Its purpose was to eliminate the provision in such section giving to each county at least one member of the House. The debate was relative to its substance, not to its form. The amendment was rejected and the original proposal was adopted; but the very debate was predicated upon the assumption that, but for this recognition of county atonomy, and the consequent concession to area representation thereby given, apportionment was to be made strictly upon the basis of population, except for the necessary deviation occasioned by the requirement that senatorial districts made up of more than one county should be composed of contiguous counties. This latter requirement would result, though a single ratio be used, in some weighting of senatorial representation in favor of the less populous counties, and may have been motivated by a desire so to do to that extent; it was more probably adopted to prevent use of the device of "gerrymandering" by future legislatures.

The constitutional and legislative construction of Section 2 likewise supports the view that use of a multiple ratio is not permitted by the Constitution. The most authoritative of these practical constructions is that of the Constitutional Convention in the first apportionment provided for by Section 4 of Article IX.

I shall not burden this opinion by a comparison of senatorial representation county by county. Suffice it to say that apportionment of senators was made strictly on the basis of the population of the several districts except that the necessity of combining contiguous counties in establishing senatorial districts made for some permitted distortion. Obviously a single ratio was used in making such apportionment. Senatorial representation was equally divided between the then urban and rural counties. The population was divided 49% and 51%. The distribution of seats in the House by Section 4 is not enlightening, since the provision giving at least one seat in the house to every county would necessarily weight representation in that body in favor of the sparsely settled counties. Except for that required deviation, representation was as nearly as could be devised, strictly on a population basis. A single ratio of about 5,000 was used. So too, in each reapportionment made by the legislature since statehood, except that of 1955, a single ratio was used for each body. So far as the record discloses, despite the difficulty of reaching any agreement on apportionment in every legislative session since 1940, the construction of Section 2 of Article IX espoused by the 1955 legislature, was not divined by its predecessors. This practical construction by the Constitutional Convention and by legislatures, appraised in the light of the objective of Article IX, carries

much weight in resolving any ambiguity which may conceivably be found in Section 2 of that Article. So weighty is it, in fact, that the practical construction placed on the same wording by the legislature of another state, loses significance.

For the reasons stated, I am of the opinion that the Reapportionment Act of 1955 violates the mandate of the Constitution, and would affirm the decision of the lower court in so holding.