305 P.2d 490

**Preston ALLEN, suing for himself and other American Indians similarly situated, Plaintiff,**

**v.**

**Porter L. MERRELL, individually and as County Clerk, Duchesne County, Utah, Defendant.**

No. 8589.

Supreme Court of Utah.

Dec. 15, 1956.

Robert W. Barker, Washington, D. C., John S. Boyden, Salt Lake City, for appellant.

E. R. Callister, Atty. Gen., K. Roger Bean, Walter L. Budge, Asst. Attys. Gen., for respondent.

CROCKETT, Justice.

Preston Allen, an American Indian residing on the Uintah Indian Reservation in Duchesne County, Utah, instituted original proceedings in this court, for himself and others similarly situated, seeking a writ to compel the defendant, Porter Merrell, County Clerk, to issue him a ballot and permit him to vote.

The refusal of the defendant, Merrell, to give plaintiff a ballot was based on the definition of "resident" as a qualification to vote contained in Par. 11, Sec. 20–2–14, U. C.A.1953, which reads:

"Any person living upon any Indian or military reservation shall not be deemed a resident of Utah within the meaning of this chapter, unless such person had acquired a residence in some county in Utah prior to taking up his residence upon such Indian or military reservation."

It is plaintiff's contention that the above definition of "resident," in practical application, denies voting privileges only to Indians residing on reservations in contravention of the Fifteenth Amendment to the Federal Constitution which declares that the right of citizens to vote shall not be denied or abridged, " * * * on account of race, color, or previous condition of servitudes"; that it offends against the equal protection clause of the Fourteenth Amendment;[1] and that it violates the privileges and immunities clauses of both Section 2 of Article IV [2] and the Fourteenth Amendment.[3]

█ That Indians are entitled to the rights and privileges bestowed upon citizens by the Federal and State Constitutions, we do not question. But the right to vote is not vested absolutely in any citizen. Nor does it find its roots in the several clauses of the Federal Constitution referred to above.[4] The right derives from the state.[5] Our State Constitution itself grants it to "every citizen of the United States" over 21 who meets the residence requirements.[6] It is well settled that the right thus granted is subject to reasonable qualifications imposed by the state.[7]

Pursuant to its inherent power, our Legislature has chosen to prescribe that residence must be in this state other than on an Indian or military reservation as a prerequisite to voting, and it is the operation of that requirement upon the plaintiff which is the basis of contention in this action.

█ The challenge of the constitutionality of this statute focuses attention upon the fundamental principles underlying the relationship between the judicial and legislative departments of government.[8] In order that the separate responsibilities and

1. "No State shall * * * deny to any person within its jurisdiction the equal protection of the laws." Sec. 1, Amendment XIV, U. S. Constitution.

2. "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." Sec. 2, Art. IV, U. S. Constitution.

3. "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." Sec. 1, Amendment XIV, U. S. Constitution.

4. Pope v. Williams, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817; Minor v. Happersett, 21 Wall. 162, 88 U.S. 162, 22 L.Ed. 627; Am.Jur.Con.Laws, Sec. 466.

5. Pope v. Williams, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817; United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588.

6. Art. IV, Sec. 2, Utah Constitution.

7. Evans v. Reiser, 78 Utah 253, 2 P.2d 615; Breedlove v. Suttles, 302 U.S. 277, 58 S.Ct. 205, 82 L.Ed. 252.

8. Sec. 1, Art. V, Utah Constitution.

functions of the departments of government may in fact, as well as in theory, be preserved, it is important that the court proceed with the utmost caution in reviewing legislative acts lest it encroach upon the prerogatives of the legislature. It is no wise within our province to pass upon the wisdom or the desirability of such enactments. If from an analysis of the entire situation there appears to be any reasonable basis for the requirements imposed by the statute which is related to its purpose of establishing proper standards as a qualification for voting, the statute must be upheld.

In support of his position that the disqualification from voting is an arbitrary and unreasonable discrimination against Indians, plaintiff points to the fact that Indians are now, for all practical purposes, emancipated to full citizenship, and are to a substantial degree self-sustaining; that under presently existing law, reservation lands are politically as well as geographically within the state of Utah;[9] that Indians share many of the responsibilities of citizenship, such as the duty of military service;[10] and that they pay some taxes, such as estate taxes on personal property, on lands which are not exempted from taxation under acts of congress,[11] and taxes levied by the state on the production from, and improvements on mineral lands leased from the tribes.[12] Further, that they are to some extent subject to the jurisdiction of state courts; and being citizens residing within the state, they have an interest in legislation which affects Indians. Wherefore plaintiff reasons that they are entitled to all of the privileges of citizenship, including the right to vote for officials who make and administer the laws.

These arguments make it desirable for us to take a comprehensive look at the status of Indians residing on reservations. We think a realistic analysis makes it manifest that there are three somewhat interrelated basic reasons which may be considered as providing a justification for the requirement that one must have established a residence in the state other than on an Indian reservation as a qualification to vote. They are: (1) That most persons residing on reservations are members of Indian tribes which have a considerable degree of sovereignty independent of state government; (2) That the Federal Government maintains a high degree of interest in and responsibility for their welfare and thus has potentially a substantial amount of influence and control over them, and

9. United States v. McBratney, 104 U.S. 621, 26 L.Ed. 869; People of State of New York ex rel. Ray v. Martin, 326 U.S. 496, 66 S.Ct. 307, 90 L.Ed. 261.

10. Totus v. United States, D.C., 39 F. Supp. 7.

11. Oklahoma Tax Comm. v. United States, 319 U.S. 598, 63 S.Ct. 1284, 87 L.Ed. 1612.

12. 43 Stat. 244, 25 U.S.C.A. § 398; 44 Stat. 1347, 25 U.S.C.A. § 398a et seq.

(3) That they are much less concerned with paying taxes and otherwise being involved with state government and its local units, and are much less interested in it than are citizens generally.

The status of the American Indian and his relationship to our government has been unique and changing. Originally they seem to have been considered independent political sovereignties with the right of self-government.[13] Article I, Sec. 8, U. S. Constitution gives congress the power to "regulate Commerce with foreign Nations, * * * and with the Indian Tribes," but it was early recognized that this concept was not entirely proper and that Indians living on reservations within the United States must of necessity have a different status than people of foreign countries. The realization that our government retained a degree of responsibility to them gave rise to the principle of guardianship.[14] However, Indians were not then regarded as citizens and consequently, the protection afforded citizens concerning their rights to vote by the Fifteenth Amendment and the Congressional Act implementing it[15] was held not to extend to them.[16]

The idea that Indian tribes on reservations within our country must be regarded in a very different light than foreign nations and that we had a high degree of responsibility for and common interest with them was further articulated in the act of 1871 which declared that the Indian tribes should no longer be recognized as independent nations.[17] Congress also then provided that individual Indians could receive lands in severalty which would be held in trust for them by the United States for a period of 25 years,[18] after which they would receive title, their wardship would then terminate and they would become citizens.[19] Since that time there has been much paternalistic federal legislation emanating from concern over their welfare premised upon the guardianship principle and governmental control over Indians. In recent years the trend has been toward complete elimination of governmental control and looking toward their full emancipation.

13. Cherokee Nation v. Georgia, 5 Pet. 1, 8 L.Ed. 25; Worcester v. State of Georgia, 6 Pet. 515, 8 L.Ed. 483.

14. McKay v. Campbell, D.C., 16 Fed.Cas. page 161, No. 8,840; Ex parte Reynolds, D.C., 20 Fed.Cas. page 582, No. 11,719.

15. 16 Stat. 140, entitled "An Act to enforce the Rights of Citizens of the United States to vote in the several States of the Union, and for other Purposes."

16. McKay v. Campbell, D.C., 16 Fed.Cas. page 161, No. 8,840.

17. 16 Stat. 544.

18. e. g. At certain times, land has been partitioned to particular Indians and citizenship has been given to those who received the land. 17 Stat. 213.

19. 16 Stat. 544.

Citizenship was first granted to Indians generally by the act of 1924, which provided that: "all non-citizens Indians born within the territorial limits of the United States be, and they are hereby, declared to be citizens of the United States." [20] However, this act did not make it entirely clear whether all Indians born *after* that date were to be citizens. The act of 1940 was purposed to clarify the prior act to the effect that such was the Congressional intent.[21]

We are entirely in accord with the objective of having Indians endowed with all of the privileges of citizenship and fully participating in the privileges and responsibilities attendant thereupon. And such is the avowed policy of our Legislature expressed in the 1955 enactment of Sec. 55–2–35, which provides:

"It is declared to be the public policy of the state of Utah to cooperate with the secretary of interior, other governmental departments and agencies, and Indian tribes in developing plans for an orderly termination of federal supervision over the persons and property of Indians to the end that Indians may become self-sustaining." Notwithstanding the desirability of that objective and the considerable amount of legislation which has been purposed toward it, it cannot realistically be claimed that it has been attained, even in theory, much less so in fact. To assume it accomplished because we might wish it so, would be to blind ourselves to reality.

The Indian tribes have not entirely lost their character as sovereign entities, but retain a substantial degree of autonomy under which they may and do operate independent of state government. They have the power to adopt a constitution, enact tribal laws to which members of the tribe are subject, to prevent the sale or alienation of tribal lands, and to negotiate with federal, state and local governments.[22] They also have the power to tax,[23] to employ counsel and to prosecute actions for the tribe.[24] As recent as March 6, 1956, the U. S. Court of Appeal for the Eighth Circuit in the case of Iron Crow v. Oglala Sioux Tribe of Pine Ridge Reservation stated, "We hold that the Indian tribes, such as the defendant Oglala Sioux of the Pine Ridge Reservation, South Dakota, still possess their inherent sovereignty excepting only where it has been specifically taken from them, either by treaty or by Congressional Act."[25]

20. 43 Stat. 253, 8 U.S.C. § 3.

21. 54 Stat. 1137, 1138; 8 U.S.C.A. § 1401.

22. 48 Stat. 987, 25 U.S.C.A. § 476.

23. Iron Crow v. Oglala Sioux Tribe of Pine Ridge Reservation, 8 Cir., 231 F.2d 89.

24. Makah Indian Tribe v. McCauly, D.C., 39 F.Supp. 75; Sampson v. Brennan, D. C., 39 F.Supp. 74.

25. 231 F.2d 89, 94.

The possibility of influence and control over persons residing on military and Indian reservations by the federal officials appears to have been an important factor motivating the passage of the questioned statute originally. That potential yet exists to a considerable extent. That Indians sustain a different relationship to the federal government than do other citizens is so patent that the contrary could not seriously be contended. They are still subject to much legislation peculiar to them.[26] Although in some areas allotments of reservation lands have been made to individual Indians, the title is still held in trust by the government, and neither it nor livestock furnished by the government can be sold without consent of the federal officer in charge of the tribe. Indians are restrained from transferring such property. Any deed given contrary to this prohibition is void;[27] and it is a crime to purchase such personal property without such consent.[28] The period of trust on Indian lands and the restrictions on alienation has been extended from time to time and recently has been extended indefinitely.[29] The reservation lands upon which they reside and from which they derive their living are not subject to taxation, and neither is their personal property which is furnished them by the Federal Government. In contrast to this, taxes upon the holdings of other citizens, particularly real estate taxes, are of prime importance to the county and state governments because they provide a large part of the operating revenues.

The Indian Service under the Department of the Interior exercises supervisory control over the Indians' use of their lands and business transacted with them generally. Federal agencies also undertake to provide for their various needs, including schools and health services. It maintains jurisdiction on reservations under Federal law with respect to the ten most common major crimes and assumes the responsibility of enforcing and prosecution for violations.[30] Congress has now by legislative act given the states the right to assume criminal and civil jurisdiction,[31] but the act did not expressly relinquish Federal jurisdiction, and Utah has not adopted an act assuming it.

■ It is not subject to dispute that Indians living on reservations are extreme-

26. Title 25 U.S.C.A.; 18 U.S.C.A. Chapter 53.

27. Taylor v. Brown, 5 Dak. 335, 40 N.W. 525.

28. 18 U.S.C.A. § 1157.

29. 25 U.S.C.A. § 462.

30. Murder, manslaughter, rape, incest, assault with intent to kill, assault with a dangerous weapon, arson, burglary, robbery and larceny. 18 U.S.C.A. § 1153.

31. 67 Stat. 588, 28 U.S.C.A. § 1360.

ly limited in their contact with state government and its units and, for this reason also, have much less interest in or concern with it than do other citizens. It is a matter of common knowledge that all except a minimal percentage of reservations Indians live, not in communities, but in individual dwellings or hogans remotely isolated from others and from contact with the outside world. Though such a state is certainly not without its favorable aspects, they have practically no access to newspapers, telephones, radio or television; a very high percentage of them are illiterate;[32] and they do not speak English but in their dealings with others and even in their tribal courts, use only their native Indian languages. Under such conditions it is but natural that they are neither acquainted with the processes of government, nor conversant with activities of the outside world generally. Inasmuch as most governmental services are furnished them, it is patent that they would not have much concern with services and regulations pertaining to sanitation, business, licensing, school facilities, law enforcement and other functions carried on by the county and state governments. This is more especially so because they are not obliged to pay most of the taxes which support such governmental functions.

It is thus plain to be seen that in a county where the Indian population would amount to a substantial proportion of the citizenery, or may even outnumber the other inhabitants, allowing them to vote might place substantial control of the county government and the expenditures of its funds in a group of citizens who, as a class, had an extremely limited interest in its functions and very little responsibility in providing the financial support thereof.

There is nothing in the statute which prevents an Indian from becoming qualified to vote the same way as any other citizen. All he has to do is to establish a residence in a part of the county where his living is not both supervised and subsidized by the Federal Government; where he foregoes the paternalistic favors there conferred, and where he assumes his responsibilites as a citizen by living on lands where he pays taxes, either directly or through his rent, and otherwise removes the detachment and lack of interest in the affairs of the state which surrounds him on the reservation.

From the considerations hereinabove discussed, it is obvious that reservation Indians, as a class, occupy a distinctly different status in their relationship to government than do other citizens. This conclusion is based upon their remaining tribal sovereignty; the influence and con-

32. Utah has no literacy requirement. This observation relates only to their present general character of life.

trol, actual and potential, of the Federal Government over them; the fact that they enjoy the benefits of governmental services without bearing commensurate tax burden, and are not as conversant with nor as interested in government as other citizens. It appears to us that this provides a reasonable basis for the classification made and for the requirement that residence in the state must be other than on an Indian reservation as a qualification to vote.

Consequently, we do not see how it can be said with any degree of certainty that the statute is a denial of the right to vote on account of race, nor that it is so unreasonable or arbitrary that it is in clear conflict with the nondiscrimination and equal protection clauses of the Federal Constitution or of the Constitution of this state. Under the well established rule that all doubts must be resolved in favor of validity and no legislative act declared unconstitutional unless it is clearly and palpably so,[33] we decline to declare this act invalid.

The writ sought by the plaintiff is denied. No costs awarded.

McDONOUGH, C. J., and HENRIOD and WADE, JJ., concur.

WORTHEN, J., concurs in the result.

33. Parkinson v. Watson, 4 Utah 2d 191, 291 P.2d 400; Newcomb v. Ogden City

Public Schools, 121 Utah 503, 243 P.2d 941.