356 P.2d 612

John ROTHFELS, suing for himself and others similarly situated, Plaintiff,

v.

Loraine B. SOUTHWORTH, individually and as Registration Agent for Tooele County, and the Board of Commissioners of Tooele County, Defendants.

No. 9332.

Supreme Court of Utah.

Oct. 10, 1960.

Hansen & Miller, Salt Lake City, for plaintiff.

Walter L. Budge, Atty. Gen., for defendants.

CROCKETT, Chief Justice.

John Rothfels, a civilian employee living on a military reservation, petitioned to compel the defendant registration agent to register him for the purpose of voting in the 1960 election. We issued an alternative writ requiring her to do so and it is sought to be made permanent.

The plaintiff, an immigrant from Germany, took employment as a civilian employee of the United States Army in January, 1953, and has since resided upon a military reservation at Dugway, Tooele County, Utah. He obtained his citizenship in February, 1956. On August 2, 1960, he tried to register to vote, but defendant refused to register him, giving as her reason that, " * * * he has stated to me that he resides on a military reservation and did not establish a residence in any other precinct in the State of Utah prior to this time." Except for that fact he had all other qualifications to vote.[1]

The question is presented: Can a civilian living on a military reservation be considered a resident of this state for the purpose of voting?

The right to vote is an important attribute of citizenship, but it derives from

---

1. Utah Const. art. IV, § 2 requires: Citizen of the United States for 90 days; age 21 years; residence in state one year, county 4 months, precinct 60 days prior to election.

the state and may be exercised only upon meeting requirements set up by the legislature.[2] Accordingly, it is appropriate to examine the statutes applicable to the problem at hand and in view of the controversy in regard to their interpretation, it is proper to look to their history and background and also to governmental policy to divine their meanings.[3]

The first section to which we direct attention is what was 20-2-14(11) U.C.A. 1953 of our statutes which was included in our election laws at statehood:

"Any person living upon any Indian or military reservation shall not be deemed a resident of Utah within the meaning of this chapter, unless such person had acquired a residence in some county in Utah prior to taking up his residence upon such Indian or military reservation."

In 1957 our legislature, by chapter 38, S.L.U.1957 repealed the above section. We think this clearly indicated an intention to remove the disability from voting based solely on the fact of residence on Indian or military reservations. The repeal of that section arose out of these facts: In 1956 in the case of Allen v. Merrell,[4] a case involving an Indian's right to vote, we upheld the constitutionality of the above statute. The United States Supreme Court granted Certiorari 352 U.S. 889, 77 S.Ct. 134, 1 L.Ed.2d 134 and while that review was pending the section was repealed. The parties are in accord that this had the effect of permitting Indians to vote and the appeal was dismissed by stipulation of counsel for the plaintiff, Allen, and the Attorney General. But the Attorney General here argues that it does not similarly apply to persons residing on military reservations. He bases his argument on Sec. 20-2-14(2) which the legislature did not repeal, but amended only by adding the emphasized word, "solely." It now reads:

"A person must not be held to have gained or lost a residence *solely* by reason of his presence or absence while employed in the service of the United States or of this state * * * while residing upon any Indian or military reservation."

The Attorney General places emphasis on the fact that the legislature retained the above section and so reads it as to preclude the plaintiff from establishing a residence for voting purposes because he lives on a military reservation.

On the other hand, the plaintiff argues that this amendment, considered in connection with the repeal of Sec. 20-2-14(11), hereinabove quoted, clearly reflects the

2. Allen v. Merrell, 6 Utah 2d 32, 305 P.2d 490.

3. See Bateman v. Board of Examiners, 7 Utah 2d 221, 322 P.2d 381.

4. 6 Utah 2d 32, 305 P.2d 490.

legislative intent to remove any disqualification to vote based *solely* on the fact that one resides on a military reservation; and that his right to vote should be determined the same as for anyone else, without such fact affecting his qualification one way or the other.

■ The defendant cites and relies on numerous cases from other jurisdictions which hold that under their various laws, where a person resides upon a military reservation over which the United States Government has exclusive control, no right to vote exists.[5] Notwithstanding the authorities cited, we see no reason why it would not be within the prerogative of the legislature to grant the right to vote to persons residing on military reservations even where the federal government had exclusive jurisdiction, if the legislature so desired, because it is entirely within its province to prescribe the conditions upon which the voting franchise may exist within our state.[6] We are not impressed with the fiction that such a reservation is in effect an island and not within the state. That idea may have some validity for some purposes, but the purpose of preventing citizens from voting is not one of them. We do not regard any of the authorities cited for the proposition that citizens living on military reservations could not vote as so holding under statutes such as ours, and certainly not where there had been a specific prohibition which was thereafter expressly repealed.

Even though the federal government may own and for certain purposes exercise a relatively high degree of control over a military reservation within the state, that control is for the purposes of its military operations and the only legitimate command or restraint it may exercise over civilian employees is that which is consistent with and necessary for such military purposes. The fact that it has and exercises such authority for that purpose does not remove the area from the jurisdiction of the state. Both the federal and the state governments have their prerogatives and duties with respect thereto. To shunt aside the sovereignty of the state in favor of exclusive jurisdiction in the federal government upon a pretext unnecessary to its function would run contrary to the fundamental theory underlying the origin of our government by which the sovereign states created the federal government itself, and exercised caution that it should be a government whose powers were limited to those expressly granted.[7]

We can see nothing in connection with military purposes that would give rise to army officials needing any such arbitrary power as to deprive citizens residing with-

---

5. See 34 A.L.R.2d 1198, et seq.
6. See Allen v. Merrell, footnote 2, supra.

7. See U. S. Const. Amend. No. VII, IX, X and XI.

in the area of any of the fundamental rights of citizenship, and there is no suggestion here that they desire any such authority. In any event it is quite inconceivable that there would be any necessity for such authority to extend so far as to prevent citizens from having the privilege of voting. It seems particularly anomalous for an agency of the state government to be so contending in a situation such as this when there is no occasion for making such a claim on behalf of the federal government.

More fundamental to the issue here presented is the fact that we do not regard this case as necessarily involving the question whether the plaintiff could establish residence to vote if he resided on a reservation over which the federal government had exclusive jurisdiction. As the matter is presented to us it is contended that some parts of the Dugway Proving Grounds are under the exclusive jurisdiction of the United States, and that other parts are not. There is no affirmative showing that plaintiff's residence is in the former, and he maintains that it is not. Inasmuch as it is shown that he is a citizen, having all the other qualifications, that establishes prima facie his right to register to vote and he must be allowed to do so unless it is clearly established that there is some basis for denying him that privilege.

The plaintiff sets forth the following undisputed facts which indicate that the federal government has and maintains something considerably less than exclusive jurisdiction on this military reservation: The right is reserved to the state to serve process, both civil and criminal; the schools located in the area are under the control and administration of the Tooele County School District; state income tax is levied and collected upon all persons living there; other state taxes are also collected upon gasoline and tobacco, and all privately owned vehicles are required to be registered with the State of Utah and have Utah license plates.

The foregoing facts make the instant case analogous to the case of Arapajolu v. McMenamin [8] decided in 1952 by the California District Court of Appeal, which we regard as well reasoned and correct in result. It held that notwithstanding there may have been exclusive jurisdiction in the federal government on the military reservations, by such facts as the foregoing, the federal government, as a practical matter, had retroceded partial jurisdiction to the state, and that this allowed persons living on the military reservations to acquire a residence for voting purposes within the state. Upon application, the California Supreme Court refused to review that decision.

8. 113 Cal.App.2d 824, 249 P.2d 318, 34 A.L.R.2d 1185.

Another case of generally similar import and result which follows and approves the California case is that of Adams v. Londeree by the Supreme Court of Appeals of West Virginia.[9] These recent decisions seem to represent the modern and what we think is the better considered view of the matter. This is particularly so when viewed in the light of developments in recent years on military reservations, and even more so when the noted changes in our statutes are considered.

Closely related to the argument concerning exclusive jurisdiction is the position taken by the defendant that the control over these employees exercised by the federal government makes their residence of such a transitory nature that they cannot qualify for voting purposes. The substantial changes in the nature of operations on military reservations since the advent of World War II have an important bearing on this argument. In former times they were populated practically exclusively by persons in the armed forces. The emphasis was upon personnel; it has shifted to materiel.

Some of these military reservations have become highly mechanized and industrialized areas with a large percentage of the population thereon consisting of civilian employees. For the convenience of all concerned they and their families reside upon the military reservation. There they live and work, attend school and church and pursue most all of the normal activities of life. Such installations have existed for so many years that from anything that is known, they are a permanent part of our social and economic life and therefore should be of our political life also. The question whether the residence requirement is met is governed by the statute,[10] and those charged with the duty of administering it. The fact that one may be living there because of convenience to his employment, and will move somewhere else if it terminates, is not unlike many other mining or industrial communities of our state. If it is in fact his only home and he intends it as his residence, the fact that his motivation for making his home there is that he has government employment will not defeat his purpose if he otherwise meets the requirements of the statute.

The considerations concerning whether the civilian employees should vote are greatly different than when sub-section 11 was originally adopted. Its purpose appears to have been to prevent the federal government from manipulating personnel, or unduly influencing them in order to control the results of local elections. In that connection it is significant to note that in amending our statutes in 1957 (chap. 38) the legislature amended sub-section (3) of 20-2-14 by adding the emphasized words:

9. 139 W.Va. 748, 83 S.E.2d 127.

10. Sec. 20-2-14, U.C.A.1953.

"No officer, soldier, *airman,* seaman or marine in the army, *airforce,* or navy of the United States shall be deemed a resident of this state in consequence of being stationed at any military, *air,* or naval station within the same."

This points up that the matter received legislative attention and that it expressly continued the interdiction against persons actively serving in the armed forces, the particular personnel which would be most subject to such manipulation and control, and for which purpose the law was originally enacted. For this reason, and because of the change in the nature of military operations on such reservations, the justification for the general prohibition originally contained in sub-section 11 has largely vanished and the salutary considerations in favor of permitting civilian employees residing on military reservations to have and exercise the full privileges of citizenship far outweigh any considerations to the contrary. The fact that the bases for preventing all persons residing on military reservations from voting has so changed and that the potential evils with respect to civilian residents is so minimal supports an interpretation of our statutes that it was the legislative intent to lift the barrier which prevented them from voting. We are in accord with the thought expressed by the great Justice Holmes wherein he is quoted as saying: "There is nothing more revolting than to have no better reason for a rule than that it was so laid down in the time of Henry IV; and it is still more revolting if the grounds upon which it was so laid down have vanished." [11] We think this has particularly cogent application to the instant controversy.

A further important point to keep in mind is that our legislature, with its undoubted prerogative of prescribing the conditions upon which the right to vote depends, has always taken it for granted that citizens having sufficient residence upon military reservations within the state could vote unless prohibited by statute. This is shown by the fact that sub-section 11, which was a general prohibition against persons residing on military reservations, was adopted at statehood, and the same may be said of sub-section 3 which still so prohibits active military personnel from voting. ·

In view of the legislature's repeal of sub-section 11 in 1957 we think it abundantly clear that it intended to take cognizance of the changes in circumstances hereinabove discussed and to remove the barrier from voting for persons residing on military reservations and to place them on the same basis as other citizens of the state in regard to acquiring a residence to vote. (Except those actively serving in the armed forces, covered by sub-section 3.)

11. Justice O. W. Holmes, by Silas Bent p. 149.

The dire consequences suggested that the federal government could affect elections by controlling or influencing such employees should give no cause for alarm. That is for the legislature to consider. If any such circumstance should come into being, or should threaten, it could by further legislative enactment remove the privilege it has now given them to vote.

The interpretation we give the law is in harmony with our statutes as they now exist and their intent as indicated by the purpose for which they came into being; and is also consonant with the ideals upon which this nation was founded and upon which its continued well-being must rest. The right to vote and to actively participate in its processes is among the most precious of the privileges for which our democratic form of government was established. The history of the struggle of freedom-loving men to obtain and to maintain such rights is so well known that it is not necessary to dwell thereon. But we re-affirm the desirability and the importance, not only of permitting citizens to vote but of encouraging them to do so.

To so interpret our statutes as to deprive one who has sought American citizenship for the very purpose of embracing our principles of liberty and democracy and thus prevent him from enjoying its advantages and participating in its processes would seem quite discordant to the ideals of American liberty, a result not to be desired and one which should eventuate only if clearly required under the law. Accordingly, even if the statutes are not as clear in this regard as may be desired, doubts should be resolved in favor of the right to vote to the end that citizens may enjoy the full rights and privileges of citizenship.

Closely related to the doctrine just stated is the well recognized rule of statutory construction that if statutes can be given different reasonable interpretations, under one of which they would be constitutional and under the other their constitutionality would be doubtful, the former will be adopted.[12] Our conclusion renders it unnecessary to consider the contention of the plaintiff that if the statutes are so interpreted as to deny him the right to vote they would be unconstitutional by discriminating against him and the class to which he belongs.

The writ previously issued is made permanent. No costs awarded.

WADE and McDONOUGH, JJ., concur.

HENRIOD, Justice (dissenting).

I dissent for several reasons:

1. The main opinion completely ignores the doctrine of stare decisis, the backbone

12. Parkinson v. Watson, 4 Utah 2d 191, 291 P.2d 400.

of our legal system, and refuses to follow a long line of cases and respected authority directly in conflict with the decision here.

In 34 American Law Reports 2d 1195, an unquestionably accurate reportorial authority, the law in cases like that involved here, succinctly is stated thus:

"In virtually all of the cases where the right of residents on a military reservation to vote in state elections has been at issue, the courts have held that the federal government exercised exclusive jurisdiction over the area and that residents therein had no right to vote in state elections."

Another eminent text, American Jurisprudence, in 18 Am.Jur. 224, Sec. 66, has this to say:

"Residence in a military reservation of the Federal Government will not give one a right to vote at a state election held in the county where the reservation is located. Similarly, where the land upon which an asylum or other institution is erected has been ceded to the United States, the inmates thereof are denied the right of suffrage upon the ground that they lose their status as citizens of the state and can no longer exercise any civil or political rights under its laws."

McCarry on Elections, 4th Ed., Sec. 89, states that:

"Where a state has ceded a given tract of land to the United States for a navy yard, arsenal or the like, and there is no reservation of jurisdiction to the state other than the right to serve civil and criminal process on such lands, persons who reside upon such lands do not acquire any elective franchise as inhabitants of such state."

And Paine on Elections, Sec. 62, says:

"Persons who reside upon land ceded by a state to the United States as the site of an arsenal or navy yard, without reservation of jurisdiction beyond the right to serve civil and criminal process thereon, are not entitled to vote as inhabitants of the state."

These pronouncements, completely contrary to the main opinion's conclusion, are applicable in cases where there has been a reservation of right to serve process, as well as where the federal government has by Congressional Act, permitted the states to tax residents of military reservations, in certain cases. The cases and authorities are almost numberless supporting the above propositions and refuting the doctrine of the main opinion.[1]

1. Commonwealth v. Clary, 8 Mass. 72; Opinion of Justices, 1 Metc., Mass., 580; Arledge v. Mabry, 52 N.M. 303, 197 P.2d 884; State ex rel. Wendt v. Smith, Ohio App., 103 N.E.2d 822; McMahon v. Polk, 10 S.D. 296, 73 N.W. 77, 47 L.R.A. 830; State v. Willett, 117 Tenn. 334, 97 S.W. 299; Sinks v. Reese, 19 Ohio St. 306;

The main opinion, in contrast to the myriad cases refusing to support it, points to but one case that to some extent might be said to do so. It is Adams v. Londeree,[2] a split decision. That case is significant, in my opinion, for the well-reasoned dissent, and it was so different factually as to be at best a watered-down authority, if at all, to support the decision here. There a lifelong resident of the state, not in any way employed by the federal government on the naval base, simply rented a vacant house on the installation, free to come and go, and with no allegience to the government or the reservation save a duty to pay rent as a tenant. The distinction, of course, is obvious.

Only other case suggested by the majority is Arapajolu v. McMenamin. It cannot support the opinion authoritatively here, as the majority well knows. It was a one-man opinion in an inferior tribunal, not by the Supreme Court of the state. Had it been written recently it would not even have been found in the Pacific Reporter, since the publishers of that work some time since have discontinued reporting such unauthoritative decisions as that upon which the majority here so heavily leans and to which it gives endorsement. The almost complete lack of authority cited in the main opinion and the quality of that such as it can muster, in light of the smothering avalanche of authority to the contrary point up the weakness of its position and its flouting of established authority to the contrary.

People, particularly when they are not apprised of the established law or true facts, or are prone to make snap judgments,

Powell v. Spackman, 7 Idaho 692, 65 P. 503, 54 L.R.A. 378; State ex rel. Wendt v. Smith, Ohio App., 103 N.E.2d 822; Merrill v. Shearston, 73 Colo. 230, 214 P. 540; 18 Am.Jur. 224, Sec. 66; 29 C.J.S. Elections § 25; McCrary on Elections, 4th Ed., Sec. 89; Paine on Elections, Sec. 62; Winthrop, Military Law and Precedents, 2 Ed., 1921, p. 898; Dig. Op.JAG, 1912, 937–938; Dig.Op.JAG, 1912–1940, p. 1; Fort Leavenworth RR Co. v. Lowe, 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264; Surplus Trading Co. v. Cook, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091; United States v. Unzeuta, 281 U.S. 138, 50 S.Ct. 284, 74 L.Ed. 761; Standard Oil Co. v. People of State of California, 291 U.S. 242, 54 S.Ct. 381, 78 L.Ed. 775; Johnson v. Yellow Cab Co., 321 U.S. 383, 64 S.Ct. 622, 88 L. Ed. 814; Kiker v. City of Philadelphia, 346 Pa. 624, 31 A.2d 289; People v. Hillman, 246 N.Y. 467, 159 N.E. 400; Commonwealth v. King, 252 Ky. 699, 68 S.W.2d 45; Webb v. J. G. White Engineering Corp., 204 Ala. 429, 85 So. 729; Concessions Co. v. Morris, 109 Wash. 46, 186 P. 655; State ex rel. Jones v. Mack, 23 Nev. 359, 47 P. 763, 62 Am.St.Rep. 811; Willis v. Oscar Daniels Co., 200 Mich. 19, 166 N.W. 496; Anderson v. Chicago & N. W. RR, 102 Neb. 578, 168 N.W. 196; Bank of Phoebus v. Bryum, 110 Va. 708, 67 S.E. 349; Foley v. Shriver, 81 Va. 568; State v. Morris, 76 N.J.L. 222, 68 A. 1103; Miller v. Hickory Groves School Board, 162 Kan. 528, 178 P.2d 214; State ex rel. Parker v. Corcoran, 155 Kan. 714, 128 P.2d 999, 142 A.L.R. 423.

2. 139 W.Va. 748, 83 S.E.2d 127.

like to espouse the right of suffrage. Such a pastime is popular. This being so, to the layman the main opinion may be accepted as a popular one. But popularity of decision never was considered in the law as necessarily being authoritative or right. In my opinion the decision in this case is neither authoritative, as has been illustrated by the universality of authority against it, nor right, since it gives without warrant, a little more of our state sovereignty to the federal goverment. After this decision, federal officials can insist that any civilian or number of civilians that they may import and place on a military reservation, shall have the right to vote, but can insist, on the other hand, that the state of Utah exercise no other jurisdiction over those persons. It is not inconceivable that in the future some might deign to control the entire political life of our state by the simple device of importing a sufficient number of transient workers to a military reservation that would constitute the balance of power in a close election. The writer of the main opinion, who also wrote the opinion in Allen v. Merrell, [6 Utah 2d 32, 305 P.2d 494] recognizes this when he said "The possibility of influence and control over persons residing on military * * * reservations by federal officials appears to have been an important factor motivating the passage of the questioned act originally. The potential yet exists to a considerable extent." And again: "It is thus plain to be seen that in a county where the Indian population would amount to a substantial proportion of the citizenry, or may even outnumber the other inhabitants, allowing them to vote might place substantial control of the county government and the expenditure of its funds in a group of citizens *who, as a class, had an extremely limited interest* in its functions and very little responsibility in providing the financial support thereof."

And it is not inconceivable to this writer, that as of now, the residents of the military reservation, many of whom would leave the state upon termination of their employment,—as the petitioner here, through counsel, already has admitted he would do,—well might control the election of candidates for Tooele County offices, who were born and bred and have had their roots in Tooele County all their lives. It is repeated that the right of suffrage is a popular thing to endorse. So is motherhood. But neither should justify any kind of illegitimacy, including the abuse of the ballot.

Since the authorities are so overwhelmingly out of harmony with the decision here, and since precedents, including the decisions of the Supreme Court of the United States having so firmly established that one living on a military reservation exclusively controlled by the federal government is not eligible to vote in state elections, even though some concessions may be made to the states, such as being allowed

to serve process, the main opinion completely loses sight of the whole problem by attempting to construe a state statute. If the law says that one living on a military reservation cannot acquire a status to vote, it means he cannot qualify as a state voter, and has no more status than one residing in Nevada would have to register and vote in Utah,[3] or a resident of the District of Columbia who cannot vote anywhere.

. The main opinion, recognizing the authorities against it, states that "Notwithstanding the authorities cited, we see no reason why it would not be within the prerogative of the legislature to grant the right to vote to persons residing on military reservations even where the federal government had exclusive jurisdiction." This is simply another way of saying that if we want to arrive at a result we desire, we are not going to pay any attention whatever to the constitution, the law or the system upon which traditionally and historically that law has been built. To conclude as has the main opinion, is to destroy the philosophy of the law as we know it.

The main opinion, recognizing the authorities against it, also stated that "We are not impressed with the fiction that such a reservation is in effect an island and not within the state." Firstly, there is no fic-

tion, and the quoted statement simply ignores the overwhelming weight of authority that says it *is* an island. This statement will come as somewhat of a surprise to the federal government, particularly in time of emergencies where the military reservation clearly and of necessity is and must be an island apart from state authority. It is a statement that closes its eyes to the Congressional interdictions as to, and the practical operations found on military bases, reservations and installations generally. Any G. I. will tell us that the Commanding Officer is all powerful. Those on the base are subject to his control with respect to both military and civilian personnel. This includes the absolute power to control locomotion on the base, the conduct of the individual, and the power to restrict any resident of the base to the area without benefit of the right of suffrage.

It is indeed unfortunate that the writer of the main opinion should quote Mr. Justice Holmes in support of the main opinion as having remarked that "There is nothing more revolting than to have no better reason for a rule than that it was so laid down in the time of Henry IV." The implication seems to be that the great Justice would not follow precedent and the established law. I do not believe he would adopt such a

---

3. Utah Constitution, art. IV, § 2: "Every citizen of the United States, of the age of twenty-one years and upwards, who shall have been a citizen for ninety days, and shall have resided in the State or Territory one year, in the county four months, and in the precinct sixty days next preceding any election, shall be entitled to vote at such election except as herein otherwise provided."

policy. To attach any significance to the quotation in connection with this case would be tantamount to saying that the Sermon on the Mount should be honored in its breach because it was enunciated during the Biblical era. It must be remembered that Justice Holmes was a soldier too, and a resident of more than one military reservation, and I believe that having been such, this soldier-lawyer, known also for his eloquent dissents, would go along with the dissent here rather than with the majority.

II. I dissent also for the following reasons: the main opinion has not confined itself to the one and only question involved here: Was it wrong for the registration agent to refuse to register the petitioner on the sole ground that he lived on the military reservation? Had the majority opinion answered this question, which was the only one raised, in the affirmative, I may have agreed. But, as is perfectly clear, even under the statute, which I think not pertinent to the basic question involved, which question is that of voter status on a military reservation under the exclusive jurisdiction of the federal government, "A person must not be held to have gained or lost a residence solely by reason of his presence or absence * * * upon any * * * military reservation." It follows as night follows day, that from that simple language there must be something other than residence to give or deny the right to vote. The petitioner recognizes this. The petitioner staked his whole claim on whether that other thing, "exclusive jurisdiction" existed here, and the court has staked its whole decision on the same premise. It is inescapable, therefore, that both petitioner and this court have conceded and must concede that voter status of the petitioner is *based on the facts,* and that to determine his status this court must be presented with facts showing the existence or lack of exclusive jurisdiction in the federal government.

In this connection, the main opinion says "The plaintiff sets forth the following *undisputed* facts which indicate that the federal government has and maintains something considerably less than exclusive jurisdiction on this military reservation." Then the main opinion says such facts are that 1) the state has a right to serve civil and criminal process on the base, 2) that schools attended by children residing on the base are administered by the Tooele School District, 3) that residents of the area pay state income taxes, 4) that other taxes on gas and tobacco are paid by them, and 5) that private vehicles are registered and licensed by the state.

In the first place the opinion grossly errs when it says the facts mentioned were set forth by plaintiff and were undisputed. There is not one word in the petition setting forth even one of the facts which the main opinion recites, and in this connection the

main opinion does not accurately report the proceedings. *The argument in the brief set forth the facts mentioned,* none of which were under oath or had been subjected to cross-examination where the penalties of perjury might prevail. *Yet, the main opinion accepts these unsworn statements adduced during the course of the argument, by counsel for petitioner, as the gospel truth.* This acceptance of pure hearsay in and of itself is an abuse of procedure in connection with the question whether a writ of mandamus should be issued, and represents a new and startling departure in the annals of legal procedure. As to the assertion that these facts were undisputed, this is another instance of inaccurate reporting, since counsel for the opposition, also in argument, refuted the contentions, and the writer of this opinion disputed the facts, which leads me to the following:

III. I dissent also on the ground that assuming the facts had been pleaded in the petition, the facts are quite contrary to those accepted without caution by the main opinion and claimed to be "undisputed." The writer of this dissent urged that this case be assigned to a master to determine the true facts. This suggestion did not meet with the approval of the majority, although our own statutes [4] invite such procedure, saying that "If the complaint seeking relief is filed in the Supreme Court, that court may order the writ returnable either before it or before any district court. If the taking of any evidence is necessary for a determination of the matter, the Supreme Court may refer the matter to a district court or to a master under the provisions of these rules, for a hearing of such facts as may be necessary."

Had the suggestion of this writer been adopted, the following undisputed facts would have been developed:

a) That although income taxes are payable to the State by residents of the military reservation, that fact does not have its roots in any state statutory or inherent authority to levy and collect the taxes, but simply by the grace of a benevolent Congress that allowed such levy and collection by virtue of Title 4, Sec. 106, U.S.Code, a concession withdrawable at any time, and without which the state could not have levied and collected these taxes. In giving the impression as did the petitioner here, and as has the main opinion, that the State had unrestricted authority to levy and collect these taxes, can be nothing more than a half-truth.

b) The fact that other taxes mentioned in the main opinion, such as gasoline and tobacco taxes were levied and collected by the state, also was the upshot of another beneficence of Congress arising out of Title 4, Sec. 104, U.S.Code, absent which the state could not collect them.

4. 65B (g) Utah Rules of Civil Procedure.

c) The fact that sales tax on commodities sold on the reservation may be imposed by the State is another gift from the federal government, under Title 4, Sec. 105, U.S. Code, terminable at will; and to demonstrate the error into which this Court has fallen in giving the impression the state has the right to levy these taxes as an adjunct of its sovereignty, Sec. 107 of the same federal Title *specifically provides that such sales tax cannot be assessed on purchases from government stores or commissaries.*

d) The fact that children of the reservation are under the jurisdiction of the Tooele School Board, is simply a convenience for the federal government, by arrangement.

e) The fact that vehicles owned by residents of the area are registered and licensed by the state obviously is because the residents of the reservation leave it on occasion, and are subject to the licensing of vehicles that are used on the highways of the state.

f) State, county and local peace officers are confronted at the gate at the entrance to the reservation by an armed guard, and permitted entrance only insofar as the authorities in charge permit it.

If the suggestion of the writer had been adopted, I am reasonably sure that the following facts also would have been developed:

a) That liquor is transported to the military reservation without state penalty for its transportation or non-payment of the state liquor tax;

b) That liquor is sold on the reservation, which fact would subject anyone to criminal penalties in Salt Lake City or Tooele City;

c) That it is sold on the base without any statutory mark-up;

(d) That it is sold at cost, without profit, and therefore there are no funds there which can or would participate in the school lunch fund program as is the case statutorily [5] with part of the profit made by sale of liquor in Tooele County, and elsewhere in the state. This results in the paradox of the taxable residents of the state furnishing funds to support the school lunch program which is taken advantage of by children of those on the base who do not, by their purchases contribute to the school lunch program. (In fairness, I would say that this disparity might have been taken into consideration in the agreement between the federal government and the school authorities in the employment of school facilities.)

If the suggestion of the writer that a fact-finder be appointed had been taken, the

5. Title 53–8–1 Utah Code Annotated.

following undisputed facts also would have been developed:

a) Title 18, Sec. 1382, U.S.Code, provides that one may be fined or jailed for violating any lawful regulation on the reservation, making no distinction as to persons;

b) Title 18, Sec. 1383, U.S.Code penalizes one knowingly violating any *restriction* on the base;

c) Title 18, Sec. 1384, U.S.Code, permits control of and punishment for certain offenses conducted even off the reservation "within such reasonable distance" as determined by federal officials.

There is no question but what the federal authorities have exclusive jurisdiction over this reservation. It must be borne in mind that exclusive jurisdiction is not tested by what concessions one having exclusive jurisdiction may give to others, but by what his power is if such concessions be withdrawn or never were made. It would be no answer for the main opinion to rejoin that as a fact concessions have been made, splitting the authority. Otherwise the federal authorities, if they desired, could exercise political control by the device of making a few concessions on an installation otherwise under the exclusive jurisdiction of the federal government, and residents there could vote where otherwise they could not.

As to exclusiveness of jurisdiction, there could be no question but what a non-resident of the area could not demand that the armed guard at the gate open it for him; there is no question but what the federal government could operate a school on the base free from state statutory curriculum or Utah statutory attendance requirements. One might inquire as to what state agency could force the armed guard at the gate to open it; whether our own court could order the commander of the base to force children living on the base to attend a state school, failing which, he would be held in contempt and jailed for such failure; and what state agency would enforce such an order. One wonders what would happen if the commander at the base declared an alert on election day which prevented the residents to vote, or better still, what the state authorities would or could do if the commander did not permit the residents of the area a two-hour lay-off period, with pay, in order to vote, which outside the area would be an offense under the election laws. One wonders what a resident of the military reservation or anyone else would or could do, if one of those residents were elected Tooele County Commissioner, but was not permitted by the commander of the military reservation to attend commission meetings or leave the base to perform his duties as county commissioner. One wonders what would happen if a resident of the area were appointed registration agent and non-residents demanded entrance to examine the official voter's registry or

the list of qualified voters made available by state statute.

IV. I dissent also for the following reason: that the court's entertaining of this particular petition, in my opinion, is a procedural abuse of the high function of the extraordinary writ of mandamus,—and what is worse, it places a premium on a plea of artificial and created expediency after a 3½ year procrastination by petitioner in pursuing his claims.

This Court was confronted with an eleventh-hour rush job, in which the petitioner gave it a five-day ultimatum to require the registration agent to register petitioner, while the latter held a stop-watch powered by a last minute marshalling of the sympathy of an uninformed public and press, to determine if this Court met the five-day deadline. In my opinion it was carefully planned, and effectively timed, but hardly out of any sincere desire on the part of the petitioner to submit his claims to an orderly and searching examination. But it worked!

Had the petitioner taken the decent, judicial, proper course in this case, he could have tested his ill-timed claims at any time after the legislation was enacted upon which he bases those claims. This was three and one-half long years prior to the assertion of those self-same ill-timed claims. He could have done it within the framework of the Declaratory Judgment Act,[6]

(an act which ironically enough, petitioner now points to in order to establish jurisdiction for testing his claims.) In such an event all of the facts could have been alleged. All would have required testimony by witnesses willing to face not only a searching cross-examination but the penalties of perjury if they falsified. A jury could have been impanelled, or if heard by the court alone, findings of fact and conclusions of law could have been framed and a judgment rendered which would have been subject to an orderly review by this Court, with a reasonable period within which to research this important problem, and with an official record before us not based on hearsay and generality, which the main opinion must admit were the bases for its decision here. It is little wonder that the petitioner chose his course carefully and with excellent timing; his claims were determined, by the highest court in the state, on hearsay statements of his own making, with complete immunity from the penalties of perjury.

As this Court well knows, and as every first year law student knows, and as every Hornbook reader knows, the writ of mandamus should be used sparingly and with the utmost caution,—never where the petitioner has had ample time to test his claims in a different forum and under other order-

6. Title 78–33–1, U.C.A.1953.

ly procedures.[7] Again I repeat that this petitioner let 3½ years go by without testing his claims with other facilities of any number of other orderly procedures. He is then allowed to come into this high Court and maneuver it into a stop-watch procedural abortion, in an atmosphere of high sounding phrases anent the right to vote, designed to arouse sympathy. In my opinion the majority of this Court not only is wrong in its decision, but it has permitted the commission of a procedural error and the prostitution of the function of one of the most sacred writs rarely available to litigants.

V. I dissent for the following reason also: that assuming that the petitioner had pursued his claims in an orderly and less inordinate fashion, he has nonetheless admitted a lack of qualification to vote in this state. One of the facts that must be present to qualify one as an elector in this state, besides a period of residing here, is, according to Title 20–2–14(1) U.C.A.1953, a residence defined as "That place * * * in which his habitation is fixed, *and to which, whenever he is absent, he has the intention of returning.*" To a question asked his counsel by one of the Justices whether petitioner here would remain in Utah if he lost his employment on the reservation, the response was "No." Under simple principles of conflicts of laws, and

under the statute, the petitioner has proven his own disqualification.

In passing, this writer takes issue with the proposition volunteered in the main opinion that military installations "have existed for so many years that from anything that is known, they are a permanent part of our social and economic life and therefore should be of our political life also." From anything that is known, the opposite has been the case in Utah, and the majority could have known this by determining factually that out of about nine of such installations in Utah, the subject reservation is but one of about three left, it being common knowledge that the Wings Airforce Base in western Salt Lake had a two-year life, ending in 1944, Fort Douglas is at least one-half closed down, a substantial portion of that reservation having been sold to the University of Utah in 1947, Camp Kearns, largest of all with thousands of personnel was closed down and replaced by a subdivision, Wendover Air Base being ordered closed in 1958, the 191st Fighter Squadron base in 1954, and the Clearfield Naval Base having been reduced materially. The gratuitous conclusions of the majority opinion relating to these bases surely would not have been made had the suggestion of this writer been adopted that a fact finding agency be appointed to assist us in our delibera-

7. Banker's Trust Co. v. District Court, 62 Utah 432, 220 P. 708; 34 Am.Jur. 831, Sec. 36, Mandamus.

tions and decision in this important case. Nor would the gratuitous statement of the main opinion have been made that except for that fact (residence on the reservation) he had all other qualifications to vote." The matter of satisfying 20–2–14(1) requiring that to be a qualified elector one must have the "intention of returning to the state" if absent, carefully was not alleged or proved, but was omitted from the petition and even negated by petitioner's own counsel who admitted the former would leave the state if his employment ceased. (parentheses ours)

I am inclined to agree generally with the patriotic expressions of the main opinion anent "The right to vote and to actively participate in its processes is among the most precious of the privileges for which our democratic form of government was established." The residents of the District of Columbia would like to hear more. The residents of the dozens of military reservations where courts have said they could not vote in state elections would like to hear more. The 18-year old soldier who risks his life on the battle field would like to hear more. The soldiers who reside on this very reservation would like to hear more. And I am sure that the respected judges in the various state Supreme Courts and the Supreme Court of the United States who decided cases cited in footnote 1 supra, would like to hear more,—and will be happy to learn that in Utah their studied opinions and pronouncements are all wrong and must bow to the principle that stare decisis no longer is a legal precept here.

The permanent writ of mandamus never should have been issued in this case by this Court, and the petition on which it was based not only should have been denied, but should have been returned with an accompanying lecture on the fair, decent and proper procedure to be indulged when seeking the benefit of this high and respected writ.

(Italics ours.)

CALLISTER, J., agrees with the dissenting opinion of HENRIOD, J.